BROWN WHITE & NEWHOUSE LLP
GEORGE B. NEWHOUSE, JR. (Bar No. 107036)
gnewhouse@brownwhitelaw.com
333 South Hope Street, 40th Floor
Los Angeles, CA 90071-1406
Tel.: 213. 613.0500, Fax: 213.613.0550

JAMES, HOYER, NEWCOMER & SMILJANICH P.A.
ELAINE STROMGREN (Florida Bar No. 0417610)
estromgren@jameshoyer.com
One Urban Centre, Suite 550
4830 West Kennedy Blvd.
Tampa, FL 33609-2589
Tel.: 813.397.2300, Fax: 813.397.2310
*Admitted Pro Hac Vice*

Attorneys for Relator
KARIN BERNTSEN

## UNITED STATES DISTRICT COURT

## CENTRAL  DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel* KARIN BERNTSEN,<br><br>                    Plaintiffs,<br><br>v.<br><br>PRIME HEALTHCARE SERVICES, INC.; PRIME HEALTHCARE SERVICES ALVARADO, LLC; PRIME HEALTHCARE SERVICES GARDEN GROVE, LLC; PRIME HEALTHCARE HUNTINGTON BEACH, LLC; PRIME HEALTHCARE LA PALMA, LLC; DESERT VALLEY HOSPITAL, INC.; PRIME HEALTHCARE SERVICES FOUNDATION, INC.; PRIME HEALTHCARE SERVICES ENCINO, LLC; VERITAS HEALTH SERVICES, INC.; PRIME HEALTHCARE SERVICES MONTCLAIR LLC; PRIME HEALTHCARE PARADISE VALLEY, LLC; PRIME HEALTHCARE SERVICES SAN DIMAS, LLC; PRIME HEALTHCARE SERVICES SHASTA, LLC; PRIME HEALTHCARE SERVICES II, LLC; PRIME HEALTHCARE ANAHEIM, LLC; DR. PREM REDDY, and DR. LUIS LEON,<br><br>                    Defendants. | Case No.: CV 11-08214 FMO(MANx)<br><br><br><br>THIRD AMENDED COMPLAINT |

BROWN, WHITE & NEWHOUSE™<br>ATTORNEYS

This is an action brought by Plaintiff/Relator Karin Berntsen on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*. In support thereof, Relator alleges as follows:

## I.

## **INTRODUCTION**

1.    Defendant Prime Healthcare Services, Inc. and the hospitals which it owns and operates through its subsidiaries (collectively referred to as "PHS") have defrauded the federal government of millions of dollars by billing for medically unnecessary inpatient short stay admissions which should have been classified as outpatient/observation cases. PHS's behavior is particularly egregious because in an effort to receive greater reimbursement from Medicare and other government healthcare programs, PHS has explicitly instructed its physicians and hospital staff to disregard the Medicare guidelines and to choose inpatient admission over outpatient/observation status in almost every instance, regardless of whether the criteria for inpatient admission has been satisfied.

2.    PHS also wrongfully increases the MS-DRG payments it receives from Medicare through upcoding by falsifying information concerning the complications and comorbidities associated with patients' diagnoses. PHS also has caused monetary damages to the government by fraudulently obtaining incentive payments under Medicare's Value-Based Purchasing Program.

3.    In addition, PHS unlawfully refuses to discharge patients who are eligible to be transferred for post-acute care. As a result, PHS compromises the well-being of its patients and fraudulently increases its payments from Medicare and other government healthcare programs.

## II.

## **JURISDICTION AND VENUE**

4.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729 – 3732. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §

1

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

1   1345 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for

2   actions brought under 31 U.S.C. § 3730.

3        5.     This Court has personal jurisdiction over Defendants pursuant to 31

4   U.S.C. § 3732(a), which authorizes nationwide service of process, because at least one

5   of the Defendants can be found in, resides in, transacts business in and has committed

6   the alleged acts in the Central District of California.

7        6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and

8   31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in

9   and transacts business in the Central District of California, and many of the alleged

10   acts occurred in this District.

11        7.     Relator is an original source as defined by the False Claims Act in 31

12   U.S.C. § 3730(e)(4)(B) and Relator has made voluntary disclosures to the United

13   States prior to the filing of this lawsuit.

14   **III.**

15   **PARTIES**

16        8.     Relator Karin Berntsen was employed at Defendant Alvarado Hospital—

17   first as the Director of Quality and Risk Management and then as the Director of Case

18   Management.  In February 2013, she became the Director of Performance

19   Improvement (PI).  Relator is a registered nurse with more than twenty-years of

20   experience in healthcare leadership and patient care positions.  She has published two

21   books regarding patient safety matters.  From 2003 to 2005, she was the Director of

22   Nursing in the County of San Diego, CA.

23        9.     Defendant Prime Healthcare Services, Inc. ("PHS") is a Delaware

24   corporation with its primary place of business at 3300 East Guasti Road, Ontario, San

25   Bernardino County, California 91761.  PHS was founded by Dr. Prem Reddy in 2001.

26   PHS began its strategy of acquiring hospitals in financial distress with its 2004

27   purchase of Chino Valley Medical Center, which was in Chapter 11 bankruptcy.  PHS

28   incorporates a model of educating doctors in the financial aspects of medicine to

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

2

917346.1

change distressed hospitals into financially stable businesses.  Through its wholly-owned subsidiaries, PHS now owns and operates fourteen hospitals in the state of California.  The Defendant hospitals, and their corresponding subsidiaries, are:

    a.  Alvarado Hospital Medical Center, located in San Diego, CA – Prime Healthcare Services Alvarado, LLC

    b.  Centinela Hospital Medical Center, located in Inglewood, CA – Prime Healthcare Centinela, LLC

    c.  Chino Valley Medical Center, located in Chino, CA – Veritas Health Services, Inc.

    d.  Desert Valley Hospital, located in Victorville, CA – Desert Valley Hospital, Inc.

    e.  Encino Hospital Medical Center, located in Encino, CA – Prime Healthcare Services Foundation, Inc. and Prime Healthcare Services Encino, LLC

    f.  Garden Grove Hospital Medical Center, located in Garden Grove, CA – Prime Healthcare Services Garden Grove, LLC

    g.  Huntington Beach Hospital, located in Huntington Beach, CA – Prime Healthcare Huntington Beach, LLC

    h.  La Palma Intercommunity Hospital, located in La Palma, CA – Prime Healthcare La Palma, LLC

    i.  Montclair Hospital Medical Center, located in Montclair, CA – formerly Prime Healthcare Services III, LLC; presently Prime Healthcare Services Foundation, Inc. and Prime Healthcare Services Montclair, LLC

    j.  Paradise Valley Hospital, located in National City, CA – Prime Healthcare Paradise Valley, LLC

    k.  San Dimas Community Hospital, located in San Dimas, CA – Prime Healthcare Services San Dimas, LLC

BROWN, WHITE & NEWHOUSE'" DUSE'"
ATTORNEYS

3

1         l.  Shasta Regional Medical Center, located in Redding, CA – Prime

2             Healthcare Services Shasta, LLC

3         m. Sherman Oaks Hospital, located in Sherman Oaks, CA – Prime

4             Healthcare Services II, LLC

5         n.  West Anaheim Medical Center, located in Anaheim, CA – Prime

6             Healthcare Anaheim, LLC

7      10.   Prime Healthcare Services Foundation, Inc., d/b/a Encino Hospital

8 Medical Center and Montclair Hospital Medical Center, ("PHSF") is a Delaware

9 corporation with its primary place of business at 3300 East Guasti Road, 2nd Floor,

10 Ontario, California, 91761.  A wholly owned and operated subsidiary of PHS, PHSF

11 was founded by a $1 million donation from Dr. Prem Reddy.  Encino Hospital

12 Medical Center and Montclair Hospital Medical Center were donated to PHSF by

13 PHS in 2009 and 2011, respectively.  PHSF is a 501(c)(3) charitable organization.

14      11.   Prime Healthcare Services Alvarado, LLC d/b/a Alvarado Hospital

15 Medical Center ("Alvarado") is a Delaware corporation with its primary place of

16 business at 6655 Alvarado Road, San Diego, California, 92120.  Alvarado was

17 acquired by PHS in November 2010.

18      12.   Dr. Prem Reddy is the founder and Chairman of the Board of Prime

19 Healthcare Services, Inc.  Reddy actively oversees the acquisition and restructuring of

20 all new hospitals acquired by PHS, including implementing uniform protocols at all

21 PHS facilities.

22      13.   Dr. Luis Leon is the regional CEO for Alvarado Hospital Medical Center

23 and Paradise Valley Hospital.  Leon was made regional CEO after the former CEO of

24 Alvarado Hospital Medical Center resigned when the hospital was acquired by PHS.

**IV.**

## REGULATORY OVERVIEW

**A.**   **Inpatient Short Stay Hospital Admissions**

28      14.   In an effort to combat Medicare fraud and abuse, The Centers for

4

BROWN, WHITE & NEWHOUSE LLP ATTORNEYS

Medicare and Medicaid Services (CMS) has increased scrutiny on the medical necessity of short stay inpatient hospital admissions.  Due to the greater reimbursement for inpatient services versus observation services, the Government requires strict adherence to inpatient admission rules.

15.   Chapter 6, Section 6.5.2 of the Medicare Program Integrity Manual states that,

> Inpatient hospital care must be medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay.  The beneficiary must demonstrate signs and/or symptoms severe enough to warrant the need for medical care and must receive services of such intensity that they can be furnished safely and effectively only on an inpatient basis.

It further provides that "factors that may result in an inconvenience to a beneficiary or family do not, by themselves, justify inpatient admission." *Id.*  Inpatient care is only required if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care were to be provided in a less intensive setting. *Id.*

16.   Chapter 1, Section 10 of the Medicare Benefit Policy Manual sets forth the following factors that should be considered by the physician when deciding whether to admit a patient as an inpatient: the severity of the signs and symptoms exhibited by the patient; the medical predictability of something adverse happening to the patient; the need for diagnostic studies that appropriately are outpatient services; and the availability of diagnostic procedures at the time.

17.   Short stay hospital stays have not only appeared on the OIG Work Plan but have also been a focus of Medicare's Program for Evaluating Payment Patterns Electronic Reports (PEPPER reports).  Many hospitals use decision support system tools such as InterQual to assist them in the inpatient admission versus outpatient/observation status decision making process.

18.   Hospitals are reimbursed by Medicare for the services they provide to inpatients on the basis of diagnosis related groups (DRGs) and to outpatients on the

917346.1

THIRD AMENDED COMPLAINT

basis of Ambulatory Payment Classifications (APCs). On average, Medicare pays approximately $4,500 to $5,000 more for a DRG than for an APC with its bundled observation fee. Therefore, improperly billing for just one inpatient stay which should have been classified as observation status every day would result in about $1.7 million in overpayments from Medicare annually.

**B.    Utilization Review is a Federally Mandated Requirement for Hospitals**

19.    Hospitals must have in effect a Utilization Review (UR) plan that provides for review of services furnished by the institution and by members of the medical staff to patients entitled to benefits under the Medicare and Medicaid programs. The UR plan must provide for review for Medicare and Medicaid patients with respect to the medical necessity of (i) admissions to the institution; (ii) the duration of stays; and (iii) professional services furnished, including drugs and biological. 42 CFR § 482.30. Having a satisfactory UR plan is a condition material to CMS's decision to reimburse a hospital's claims, and a hospital's failure to meet this requirement violates conditions material to that payment.

**C.    Medical Severity – Diagnostic Related Groups under the Medicare Inpatient Prospective Payment System**

20.    Hospitals such as the PHS Defendants are reimbursed for their inpatient services under the Medicare Inpatient Prospective Payment System (IPPS). Under this system, the ICD-9 Procedure Code and the ICD-9 Diagnostic Code (and in some cases age, sex and demographics) determine the appropriate MS-DRG classification. ICD-9 procedures will typically be grouped to a MS-DRG classification which indicates: with major complications and comorbidities (MCC); with complications and comorbidities (CC); or without complications and comorbidities (without CC/MCC).

21.    Complications and Comorbidities typically increase the reimbursement rate for an MS-DRG. Thus, patients' complications and comorbidities must be

BROWN, WHITE & NEWHOUSE™ LLP
ATTORNEYS

accurately recorded in order to ensure that the hospital is appropriately reimbursed by Medicare.

**D.      Duty to Report and Return Overpayments from Medicare**

22.    The Medicare and Medicaid program integrity provisions, 42 U.S.C. § 1320a-7k(d), state as follows:

> **(d) Reporting and returning of overpayments**
>
> **(1) In general**
>
> If a person has received an overpayment, the person shall –
>
> (A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and
>
> (B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.
>
> **(2) Deadline for reporting and returning overpayments**
>
> An overpayment must be reported and returned under paragraph (1) by the later of --
>
> (A) the date which is 60 days after the date on which the overpayment was identified; or
>
> (B) the date any corresponding cost report is due, if applicable.
>
> **(3) Enforcement**
>
> Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31) for purposes of section 3729 of such title.

## V.

## FACTUAL ALLEGATIONS

**A.      False Claims Act violations resulting from improper inpatient hospital admissions and fraudulent claims for DRG payments based on upcoding**

THIRD AMENDED COMPLAINT

23.     In November 2010, Defendant Prime Healthcare Services purchased Alvarado Hospital.  Subsequent to the purchase, Alvarado's entire executive team, including the CEO Harris Koenig, resigned and Dr. Luis Leon was installed as the Regional CEO overseeing Alvarado Hospital.  PHS's Chairman of the Board is Dr. Prem Reddy whose medical specialties are internal medicine and cardiology.

24.     Approximately seventy-percent of Alvarado Hospital's patients are covered by Medicare and other federal healthcare programs.  Approximately twenty-percent are covered by Medicaid. The vast majority of Alvarado's patients are initially treated at the hospital's emergency room where a determination is made by attending physicians as to whether the patient should be placed under observation or admitted as an inpatient.

25.     Prior to PHS's takeover of Alvarado, Relator, as the Director of Quality and Risk Management, in conjunction with the then in-place executive team, implemented a number of controls to preclude abuse of Medicare regulations regarding short stay inpatient hospital stays.  These controls augmented the McKesson Company, InterQual decision support computer program then in use at Alvarado. Statistical reviews conducted subsequent to the implementation of Relator's procedures confirmed Alvarado's one-day stay admissions were well within accepted norms.

26.     In December 2010, after the takeover by PHS, a meeting was held during which the former Chief Operating Officer, Darlene Wetton, informed the Medical Staff Department of Medicine Committee that PHS does not do observation, but admits all patients as inpatients.  Thomas Young, MD the immediate past chief of the Department of Medicine conveyed to Ms. Wetton that he strongly disagreed with PHS's directive not to use observation status and that he personally would continue to identify observation patients when appropriate.  Ms. Wetton resigned before the end of January 2011.

THIRD AMENDED COMPLAINT

917346.1

27.     Also discussed at the December 2010 meeting were the new chest pain pre-printed order sets.  After the takeover, PHS replaced the chest pain order forms currently in use at Alvarado with new forms that no longer included a check-off to select observation status as an option for site of service.  The Medical Executive Committee in a memo dated December 8, 2010 to the Alvarado Hospital Governing Board (of which Dr. Prem Reddy is the Chairman) made a formal request to add a check-off for observation to the new order sets. Despite this request, the check-off for observation was not added back on to the forms.  The memo also stated that these "new order sets are used throughout the Prime Healthcare system."  The "Forms Fast" system is the name of the computer system used by PHS to generate forms for all of the hospitals it owns and operates.

28.     In January 2011, more than 250 employees, including most of Alvarado Hospital's Quality and Risk Management Department staff were dismissed by PHS.  At about the same time, Dr. Reddy implemented a monthly Hospitalist Meeting attended by the senior and high-volume admitting physicians as well as key administrators.  The first such meeting was convened on February 1, 2011 at which time Dr. Reddy startled those present by stating, "We don't do observation.  All patients should be inpatient.  You can always find a reason to make the patient an inpatient."

29.     Dr. Reddy reiterated his instructions concerning inpatient admissions at subsequent Hospitalist meetings attended by Relator, including a meeting on May 3, 2011 at which he also encouraged those present to upcode by adding complications or comorbidities such as encephalopathy and fecal impaction to a diagnosis in order to increase the DRG reimbursement rate.  For example, he stated:

> "If the patient is elderly, you should add encephalopathy for a higher payment. You are missing some of these elderly patients.  But, be careful . . . I don't want to go to jail, ha, ha, ha."

917346.1

THIRD AMENDED COMPLAINT

"If you code fecal impaction in GI bleed diagnoses, I can get $3,000 more per case."

"If the patient leaves against medical advice you are free to document whatever conditions you want."

30.    Dr. Reddy's instructions to upcode by exaggerating complications or comorbidities also resulted in increases in improper diagnoses of conditions including, but not limited to, septicemia, malnutrition, acute heart failure, and autonomic nerve disorders.  At a December 13, 2013 meeting, detailed *infra*, Reddy instructed Prime physicians and administrators to diagnose heart failure as "acute" rather than "chronic" so that hospitals could receive higher reimbursement amounts.  Reddy specially told Dr. Emdur that "you cannot admit a patient for chronic systolic heart failure.  It has to be acute."

31.    Within weeks of Alvarado's purchase, the coding manager, Joseph Ingranda resigned.  Subsequent to the February 1, 2011 meeting, Relator was told by a hospital coder, that the coder was instructed to make no coding distinction between atrial fibrillation and atrial flutter, but rather to code at the highest paying DRG.  That coder resigned shortly thereafter as did her supervisor, Lori Cardle, vice-president of Revenue Cycle.

32.    At the August 23, 2011 Case Management meeting, Dr. Leon confirmed the previous statements regarding patient observation status and specifically instructed that the Case Management Department no longer be involved in the process of assisting with the identification of observation status and that the use of the InterQual system to evaluate observation status be discontinued.

33.    By prohibiting the Case Managers from being involved in and from reviewing the decisions regarding inpatient admissions, PHS was in direct violation of the CMS requirement that a hospital must have in effect a utilization review (UR) plan that must provide for review of Medicare and Medicaid patients with respect to the

10

medical necessity of admissions to the institution.  42 CFR § 482.30.  Prohibition of effective utilization review with regard to inpatient admissions was one of the ways in which PHS was able to carry out and intentionally disguise its fraudulent scheme of improperly admitting individuals as inpatients who did not meet medical necessity for inpatient admission as opposed to placing them in observation.

34.     Prior to the August 23, 2011 Case Management meeting, Dr. Leon instructed Dr. Larry Emdur, a lead physician, to designate one out of five chest pain patients for observation status in an apparent effort to make it more difficult for auditors to detect PHS's deliberate practice of under-identifying observation status. Nevertheless, the Program for Evaluating Payment Pattern Electronic Report (PEPPER) for Alvarado began to reflect an inordinate increase in one-day stays, respiratory infection diagnoses, Septicemia infection diagnoses and other anomalies.

35.     When Relator discussed her concerns regarding the observation status changes with Dr. Leon, he informed her that observation billing was his responsibility and if Medicare comes after him, he will "throw his group of lawyers at them."

36.     At a September 2, 2011 meeting called by Dr. Leon, he instructed the Emergency Department manager, Tammy Russell, to eliminate references to observation status on hospital admission forms.  Later in that meeting, Ms. Russell mentioned that a new ER doctor, Donald R. Sallee identified six observation status patients on the night of September 1-2, provoking Dr. Leon to comment: "Six!  Six observation patients in one night!  That is not right.  We should do six observation patients in one year!"  He then instructed Ms. Russell to provide him the medical files of those patients and, after commenting, "These new ER doctors need to be trained," instructed Ms. Russell to summon Dr. Sallee to a subsequent private meeting.

37.     Relator was present at several meetings where Prem Reddy directly and clearly instructed internal medicine physicians, known as the Emergency Associate (EA) group, to not admit chest pain patients as outpatients, but instead to find a reason

11

BROWN, WHITE & NEWHOUSE" "USE"
ATTORNEYS

1  to admit them as inpatients because the Medicare payments are much higher for

2  inpatients.

3     38.   As an instructional exercise regarding enhanced reimbursement coding at

4  the September 6, 2011 Hospitalist Meeting, Dr. Reddy personally reviewed and

5  manually altered patient records without consulting treating physicians.  He thereafter

6  handed the records to Dr. Leon who reviewed the changes.  In turn, Dr. Leon handed

7  them to Marianna Martinez, Director of Health Information Systems to effect the

8  changes.  At this same meeting, Dr. Manorama Reddy said to Dr. Prem Reddy, "We

9  are not using observation like you told us, and almost all patients are admitted as

10  inpatients."  Dr. Reddy nodded affirmatively to Dr. Manorama Reddy when she made

11  this statement.

12     39.   Relator has a factual basis for her allegation that the improprieties

13  occurring at Alvarado Hospital are common to the other medical facilities operated by

14  PHS for the following reasons:

15  - Dr. Leon is the CEO of both PHS's Alvarado and Paradise Valley
16    hospitals;

17  - Dr. Krishna P. Surapaneni, a vendor with MedWrite Biz for PHS'
18    hospitals commented to Relator, "PHS does not do observations";

19  - Alvarado shares its ER doctors with other PHS hospitals including
20    Centinela Hospital Medical Center, Chino Valley Medical Center, Encino
21    Hospital Medical Center, Huntington Beach Hospital, La Palma
22    Intercommunity Hospital, Montclair Hospital Medical Center, Sherman
23    Oaks Hospital and San Dimas Community Hospital;

24  - Billing for all PHS hospitals is centralized at PHS' Ontario headquarters;

25  - Dr. Reddy personally reviews and, if necessary, modifies billings prior to
26    submission to government healthcare programs; and

27  - PHS uses the same forms for all of its hospitals.  For example, the
28    December 8, 2010 memo from the Medical Executive Committee to the

12

BROWN, WHITE & NEWHOUSE
ATTORNEYS

Alvarado Hospital Governing Board stated that the new order sets (without the observation check-off ) are "used throughout the Prime Healthcare system." The "Forms Fast" system is the name of the computer system used by PHS to generate forms for all of the hospitals it owns and operates.

- Employees from other PHS hospitals have indicated that fraudulent activities similar to those witnessed at Alvarado are occurring at their hospitals as well. For example, the Director of Case Management at Paradise Valley Hospital told relator "we don't do observation."

40.     PHS's fraudulent activities described above are ongoing.  PHS continues to engage in upcoding, falsifying diagnoses, and improper inpatient admissions.

41.     Relator estimates that PHS Alvarado's fraudulent short stay inpatient admission billings to government healthcare programs exceeds $4 million. Considering Alvarado is a typical hospital within the PHS system; the probability that all other PHS facilities are falsely billing Medicare in the same manner as Alvarado; and that some of those hospitals have been within the PHS system for at least six years, Relator conservatively estimates that PHS's false billings just with regard to improper short-stay inpatient admissions alone exceeds $50 million.

42.     In addition to the damages described above due to PHS's inpatient admissions which did not meet inpatient criteria, PHS is also liable for damages due to Medicare payments it received for inpatient admissions made during the time period during which it was refusing to perform its federally mandated utilization review functions.  PHS's decision to prohibit utilization review tainted all of its hospitals' inpatient admission decisions because these admissions were not subject to any form of review to ensure the medical necessity of admissions to the institution. Medicare would not have authorized payment for these inpatient admissions if it had known that PHS had prohibited any type of utilization review in connection with inpatient admission decisions.

13

917346.1

43.     Alvarado Hospital continued the practice of prohibiting UR until approximately May of 2012 when CFO Brian Kleven decided that failing to perform UR functions was too risky for the hospital from a liability standpoint.  Mr. Kleven was also concerned that Medicare would cease to reimburse Alvarado for inpatient admissions if Medicare learned that Alvarado was in violation of its obligation to implement an effective UR. Even though Alvarado Hospital eventually resumed UR, the other PHS hospitals have continued to prohibit UR with regard to inpatient admissions.  Furthermore, despite the reimplementation of UR at Alvarado, the billing for fraudulent short-stay inpatient admissions at Alvarado continued.

44.     Defendants' fraudulent activities described above have caused the submission of false or fraudulent claims for payment which have caused monetary damages to the government.  In addition, the fraudulent conduct has resulted in Defendants knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. Defendants, due to fraudulent activities such as improper inpatient admissions, upcoding, and falsifying complications, have received overpayments from Medicare and have failed to report and return them within the time periods specified in 42 U.S.C. § 1320a-7k(d)(2).

**B.     Specific Instances of Fraudulent Inpatient Hospital Admissions**

45.     In the course of her professional responsibilities, Relator has access to PHS' billing information and a daily patient census, which allows her to view patient-specific information concerning dates of admission, diagnoses, the names of treating physicians, and DRG billing and reimbursement data.

46.     As a result of this access, Relator has evidence of specific instances in which PHS has wrongfully admitted Medicare patients to the hospital as inpatients when they should have been placed under observation instead.  The patients in the chart below were admitted to Alvarado Hospital as inpatients even though the medical necessity for an inpatient admission had not been satisfied.  In each of these patient-

14

917346.1

specific examples, PHS unlawfully submitted claims to Medicare, which the government reimbursed.  Had CMS known of the falsity of these claims, it would not have paid them.

| Patient | Date | Inpatient Diagnosis | Findings | DRGs Submitted and Reimbursed | Physician's Initials |
|---|---|---|---|---|---|
| A | 9/11/2011 | Chest Pain | 12 lead ECG normal Troponins normal | 392 Esoph, Gast & Misc Dig Disorder | PL |
| B | 9/16/2011 | Chest Pain | 12 lead ECG normal Troponins normal | 313 Chest Pain | HT |
| C | 9/11/2011 | Dizziness | 12 lead ECG normal CBC/Chemistry normal | 074 Cran & oerif Nerv Dis | RE |
| D | 8/1/2011 | Chest Pain | 12 lead ECG normal Troponins normal | 313 Chest Pain | RE |

47.     Relator has evidence of several additional instances of fraudulent inpatient admissions which are not represented in the above chart but will be provided to the government in the disclosure materials.

**C.   Additional examples of fraudulent claims for DRG payments resulting from unlawful upcoding**

48.     On December 13, 2013, Relator attended a meeting conducted by Defendant Reddy where Reddy instructed Prime physicians and administrators on how to unlawfully upcode certain medical diagnoses in order to maximize Medicare reimbursement.  At this meeting, Reddy explained how to change medical records of patients after the attending physicians complete their diagnoses.   At no time did Defendant Reddy personally provide clinical evaluation of any of these patients. In

15

1  fact, most of these patients already had been discharged from the hospital at the time

2  their medical records were being altered.

3    49. At this meeting, Defendant Reddy repeatedly stated that the policy of

4  intentionally misrepresenting diagnoses is implemented through all hospitals within

5  PHS. As a result of this widespread practice of upcoding, Reddy is orchestrating the

6  inflation of the MS-DRG weight from Non-Complicating or Comorbid Conditions to

7  Major Complicating or Comorbid Conditions, resulting in higher weighted payments

8  from Medicare. This illegal and systemic practice also compromises patient safety by

9  causing unnecessary and inappropriate medical services to be performed on patients.

10    50. For example, Defendant Reddy instructed Prime physicians and

11  administrators to diagnose patients with aspiration pneumonia even though a much

12  higher percentage of pneumonia cases are healthcare acquired pneumonia.

13  Specifically, while examining a patient's record, Reddy stated "[T]his patient is a

14  pneumonia patient, but when they have pneumonia in elderly, write 'possible

15  aspiration pneumonia.' That is a higher weight." Reddy then went on to criticize the

16  treating physicians for prescribing drugs such as Vancomycin (even though

17  Vancomycin is the proper drug for treatment of healthcare acquired pneumonia – the

18  condition with which most of these patients were originally diagnosed by their

19  treating physicians). Reddy further suggested that with regard to a specific

20  pneumonia patient, additional descriptions and conditions including "confused,

21  elderly, ischemia, and failure to thrive" should be added to the patient's records even

22  though he had never seen the patient.

23    51. During this meeting, Dr. Reddy was critical of certain doctors who were

24  not improperly diagnosing patients. Reddy attempted to intimidate the doctors into

25  following his directives by belittling those doctors who were not following his

26  practices by describing them as "dwarves." At one point, Reddy referred to a well-

27  respected physician, Alvarado's Infectious Disease Specialist, Dr. Butera, as "old

28

THIRD AMENDED COMPLAINT

917346.1

BROWN, WHITE & NEWHOUSE" USE"
ATTORNEYS

fashioned" for prescribing Vancomycin and directed other physicians to "educate" Dr. Butera.

52.     Generally, about 3% of pneumonias are aspiration, and according to the 2013 coding data, the reimbursement rate for aspiration pneumonia (MS-DRG 177) is $11,302, while the reimbursement rate of simple healthcare acquired pneumonia (MS-DRG 179) is only $5,389.   Additionally, Defendants' practice endangers pneumonia patients because they are treated with inappropriate and medically unnecessary drugs, rather than with the medications normally used to treat simple pneumonia, such as Vancomycin.

53.     At this meeting, Defendant Reddy further directed physicians to upcode "pre-renal" conditions as Vasomotor Nephropathy ("VMN").   Current Medicare coding guidelines state that VMN is renal failure, and not a "pre-renal" condition. Defendant Reddy further instructed PHS's Emergency Department physicians to diagnose all elderly patients with any evidence of dehydration or confusion as suffering from encephalopathy or possible encephalopathy.

54.     As a result of these practices, Reddy is elevating the MS-DRG weight from Non-Complicating or Comorbid Conditions to Major Complicating or Comorbid Conditions, resulting in fraudulent claims submitted to improperly generate excessive Medicare reimbursements and overpayments.

55.     Also during the December 13, 2013 meeting, Defendant Reddy repeatedly instructed physicians to insert the word "possible" before several diagnoses in order to receive a higher reimbursement.   According to the ICD-10-CM Official Guidelines for Coding and Reporting (2013) "If the diagnosis documented at the time of discharge is qualified as 'probable', 'suspected', 'likely', 'questionable', 'possible' or 'still to be ruled out', or other similar terms indicating uncertainty, code the condition as if it existed or was established."

56.     Defendant Reddy instructed Emergency Room physicians to "set the stage for other doctors" knowing that the "possible" diagnosis likely would not be

17

1    eliminated by a subsequent physician.  Defendant Reddy repeatedly stated "possible

2    this, possible that, possible this" as the Prime method for describing patient diagnoses,

3    even when there was no medical basis for doing so, thereby allowing the coders to use

4    a higher weight MS-DRG.

5    **D.     False Claims resulting from refusal to transfer or discharge patients**

6        57.    Hospitals are ordinarily entitled to full DRG payment when patients are

7    discharged to their home following a covered inpatient stay.  However, for certain

8    circumstances involving acute care hospitals, CMS has instituted modified DRG

9    payment policies which result in reduced DRG payments based on length of stay and

10   discharge setting criteria.  CMS instituted these payment policies so that acute care

11   hospitals do not receive full DRG payments for Medicare patients that are discharged

12   early and then admitted for additional medical care in other clinical settings.  These

13   DRGs are referred to as "Transfer DRGs."

14       58.    Transfer DRGs include a reimbursement rate that is lower than full DRG

15   payments, because the acute care hospital is required to split the DRG payment with

16   the provider that treats the patient after discharge.  The reduction in payment follows a

17   formula that depends on the patient's actual length of stay ("LOS") and the geometric

18   mean LOS for that DRG.

19       59.    CMS defines a "transfer" as a discharge of a Medicare eligible hospital

20   inpatient to (a) a non-IPPS hospital or a distinct non-IPPS unit, long-term care

21   hospitals, psychiatric hospitals, and cancer hospitals; (b) a skilled nursing facility; or

22   (c) to a home under a written plan for home health services beginning within three

23   days of discharge.

24       60.    Hospitals are responsible for identifying those discharges to which the

25   post-acute transfer rules apply by reporting the appropriate patient discharge status

26   code.

27       61.    Refusing to discharge patients when appropriate raises numerous patient

28   safety concerns.  Increasing a patient's length of stay, while under certain

18

917346.1

circumstances medically necessary, nevertheless exposes the patient to a greater risk of experiencing complications such as hospital acquired infections, medical errors and falls. For this reason, it is not in the patient's best interest to unnecessarily extend his/her length of stay, especially when the treating physician has determined that treatment in an acute care hospital is no longer medically necessary. Unfortunately, improperly extending patients' lengths of stay is the practice that Defendants engaged in for the sole purpose of fraudulently increasing the reimbursements received from government healthcare programs.

62.     Relator is aware that from at least January 2012 through the present, Defendants have routinely and intentionally circumvented CMS's transfer DRG policies by forcing patients who are ready to be discharged to remain at the hospitals for longer than medically necessary, rather than having the patients transferred to another appropriate health care facility. As a result, Defendants qualify for the higher reimbursement rate normally reserved for standard DRGs and can avoid the lower reimbursement rates associated with Transfer DRGs.

63.     Two forms were circulated by Prime Corporation showing handwritten notes by non-treating Prime Staff, suggesting that certain patients had been discharged too soon and how increasing those patients' lengths of stay could avoid the fee splitting resulting from transfer DRGs.

64.     On November 15, 2012, Relator attended a meeting with various case managers, including Mohammed Ibrahim, a Clinical Documentation Information Specialist ("CDIS") at Alvarado Hospital. Ibrahim informed Relator that, at least twice a week, Defendant Reddy provides Ibrahim with multiple case reviews of Medicare patients that Reddy believes were discharged too soon. At no time has Defendant Reddy been the treating physician for these patients.

65.     Additionally, Defendant Reddy instructed Ibrahim and other CDISs to begin taking steps to avoid the Transfer DRG classification by finding ways to

19

917346.1

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

BROWN, WHITE & NEWHOUSE" USE"
ATTORNEYS

1   influence the treating physicians to increase individual patients' LOS, thereby

2   maximizing the hospitals' reimbursement rate.

3       66.    For example, Patient AA was admitted to Alvarado Hospital on

4   November 7, 2012 and was administered services that have a geometric mean LOS of

5   5.1 days.  The initial DRG was coded as 208, Respiratory System Diagnosis with

6   Ventilator Support less than 96 hours.  Because of the progression of the patient's

7   condition, the DRG was changed to 207, Respiratory System Diagnosis with

8   Ventilator Support less than 96 hours.  The patient had a progressive course of

9   medical issues that was treated and the patient's DRG was finalized as 4 TRACH w/

10  MV 96+ hrs. OR PDX EX FACE, MOUTH, NECK W/O MAJ OR.  However, when

11  Patient AA was going to be discharged, Defendant Reddy circulated the medical

12  billing paperwork among Ibrahim and other CDISs with handwritten notes alerting the

13  CDISs that they should not allow Patient AA to be discharged more than three days

14  before the target geometric LOS.

15      67.    As a consequence of the pressure by Defendant Reddy to avoid the

16  reimbursement fee-splitting associated with Transfer DRGs, physicians began

17  refusing to discharge patients. Patient AA was extubated on November 20, 2012 and

18  appeared ready for transfer to a post-acute facility.  Relator is aware that on or about

19  November 20, 2012, Dr. Neelakatan Ramineni, a physician at Alvarado Hospital, had

20  written orders to transfer this patient to a post-acute care facility.  However, upon

21  learning that the patient was going to be discharged several days before the geometric

22  LOS of 22.2 days, Dr. Ramineni canceled the transfer order and held the patient in

23  Alvarado Hospital's  Advanced Care Unit (ICU step down unit ) until the full

24  geometric LOS days were reached, thereby allowing Alvarado Hospital to receive the

25  full reimbursement rate.  Notably, Defendant Reddy had been advising Dr. Ramineni

26  and his associate medical group members to attempt to meet the full geometric LOS at

27  Alvarado Hospital for the purpose of receiving higher reimbursement from Medicare.

28

68.     Dr. Richard A. Mayer, another physician at Alvarado Hospital, discovered that the tracheostomy patient had been ready for transfer and voiced his concerns regarding the obvious patient safety issues of keeping the patient longer than what was medically necessary.  In spite of these objections, Dr. Ramineni refused to transfer the patient until the entire geometric LOS had been reached.

69.     Relator is aware of additional fraudulent practices at Prime in order to increase patients' LOS.  Under certain limited conditions, Medicare will pay some nursing home costs for Medicare beneficiaries who require skilled nursing or rehabilitation services. To be covered, the patient must receive the services from a Medicare certified skilled nursing home after a qualifying hospital stay. A qualifying hospital stay is the amount of time spent in a hospital just prior to entering a nursing home. This is at least three days.

70.     At the December 13, 2013 meeting detailed in Paragraph 48, *supra*, Defendant Reddy instructed hospital administrators and physicians to have the nursing homes give the hospital administrators an internal sheet of patients whose Medicare days have expired so when one of the patients gets sick, the nursing home sends the patient to the hospital. This hospital stay can then generate a three day qualifying stay in the hospital, extending a patient's Medicare benefit period or beginning a new Medicare benefit period in the nursing home.

71.     By promoting the transfer and admission between the nursing home and the hospital, the process allows the nursing homes to avoid lower paying daily Medi-Cal rates (~$300 per day) and receive the higher Medicare daily rates (~$600 per day). Defendant Reddy promoted the use of the internal list and tracking the diagnoses explicitly to increase referrals to Alvarado Hospital and to allow the nursing homes to obtain maximum reimbursement amounts from Medicare.

72.     Defendants' fraudulent activities described above have caused the submission of false or fraudulent claims for payment which have caused monetary damages to the government.  In addition, the fraudulent conduct has resulted in

21

THIRD AMENDED COMPLAINT

1  Defendants knowingly concealing or knowingly and improperly avoiding or

2  decreasing an obligation to pay or transmit money or property to the Government.

3  Defendants have received overpayments from Medicare and have failed to report and

4  return them within the time periods specified in 42 U.S.C. § 1320a-7k(d)(2).

5  **E.**    **False Claims resulting from violations of the Value-Based Purchasing**

6      **program**

7      73.    Value-Based Purchasing (VBP) is a program that financially incentivizes

8  hospitals to perform at the top of the scale in 12 quality measures and 8 patient

9  satisfaction measures. Hospital employees (usually quality staff) review medical

10  records and complete complex data forms with guidelines from Medicare on

11  diagnoses including, heart attack, pneumonia, heart failure and a select group of

12  surgical patients. The data is submitted to an organization contracted by CMS and

13  ultimately the data is publicly reported on the Medicare Hospital Compare Website.

14  A hospital may keep up to 1% of their annual Medicare DRG payment update if the

15  hospital exceeds national benchmarks for the best performing hospitals.  CMS has a

16  very sophisticated scoring system to calculate a hospital's performance measures.

17  Nationally, the funds equal about $850 million dollars which will be spread out

18  among the top performing hospitals.

19      74.    Previously, Medicare incentives were 0.4% of the annual Medicare DRG

20  payment update made to hospitals for accurate collection of data.  Beginning July 1,

21  2011, performance and achievement will be measured.  The best performing hospitals

22  will receive up to 1% of their Medicare DRG payment update and lower performing

23  hospitals risk losing up to 1% of their annual Medicare DRG payment update.  This

24  will rise gradually to 2% of the annual Medicare DRG payment update by 2017.

25  Hence, hospitals are motivated to score at the 100% level in these indicators. There

26  are validation reviews performed by an organization contracted with Medicare;

27  however, a very small number of medical records (5 per quarter) are validated by

28  CMS.

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

THIRD AMENDED COMPLAINT

917346.1

75.     In December 2010, after PHS purchased Alvarado Hospital, the PHS Corporate Director of Performance Improvement, Harsha Upadhyay, told Relator that Dr. Prem Reddy would not tolerate any score under 100% and that Mr. Upadhyay was to visit the PHS Hospitals and account for any quality indicator that was not 100%.

76.     In May of 2011, an employee of Alvarado Hospital, Theresa Jocson, RN, explained to Relator that she was asked by Mr. Upadhyay to place a document in the medical record retrospectively, which was not originally in the chart. Inclusion of this document in the record would have resulted in a higher score for one of the quality indicators. Ms. Jocson refused to place the document in the chart, and she notified her immediate supervisor, who also stated that information which was not originally part of the medical record should not be placed in the chart.

77.     Before PHS purchased Alvarado Hospital, Relator, as Director of Quality and Risk Management, worked to improve Alvarado Hospital's quality scores through multiple methods including committee efforts, educational training, and performance improvement techniques. Although Alvarado made progress over the years, it had not reached 100% in all areas. In fact, it is almost impossible for a hospital to obtain a score of 100% in all categories on a consistent basis. Despite this fact, the following PHS hospitals have been consistently at 100% for several years: LaPalma Intercommunity Hospital, Huntington Beach Hospital, West Anaheim Medical Center, San Dimas Community Hospital, Sherman Oaks Hospital. Based on the direction from PHS's Corporate Director of Performance Improvement and on Relator's expertise in this area, Relator believes that records at these hospitals have been altered inappropriately to meet the 100% compliance requirements in order to receive the financial incentives provided under the Value-Based Purchasing program.

78.     When the Medicare incentives were 0.4% of the annual Medicare DRG payment update, the PHS hospitals identified above which scored 100% each received approximately $300,000 to $1 million additional dollars in incentive payments each year depending on the size of the hospital.

BROWN, WHITE & NEWHOUSE™ LLP
ATTORNEYS

79.     Relator suspects that PHS is continuing to engage in this fraudulent behavior in order to qualify for VBP incentive payments since future payments based on hospital performance during the time period from July 1, 2011 to March 31, 2012 will increase from 0.4% to 1%.  The amount of money at stake is now even greater, especially since lower performing hospitals will not only fail to receive an incentive payment but may also have to forfeit up to 1% of their annual Medicare DRG payment.

## VI.

### FIRST CLAIM FOR RELIEF:

**A.     Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)**

80.     Relator incorporates paragraphs 1 - 80 of this complaint as though fully set forth herein.

81.     As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare and other government healthcare programs by billing for medically unnecessary inpatient short stay admissions which should have been classified as outpatient/observation cases; by prohibiting utilization review with regard to its inpatient admissions; by wrongfully increasing their DRG payments from Medicare by falsifying information concerning patients' diagnoses, complications, and comorbidities; by improperly increasing patients' lengths of stay; by failing to report and return overpayments from Medicare within the required time period; and by fraudulently obtaining incentive payments under Medicare's Value-Based Purchasing Program.

82.     In doing so, Defendants have violated:

(1)   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

BROWN, WHITE & NEWHOUSE LLP
ATTORNEYS

(2) 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

(3) 31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

83.    To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. § 3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to amendment, by engaging in the above-described conduct.

84.    Because of the false or fraudulent claims made by Defendants, the United States has suffered, and continues to suffer damages.

## **PRAYER**

WHEREFORE, Relator requests that judgment be entered against Defendants ordering that:

1.    Defendants pay an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

2.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3.    Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*;

THIRD AMENDED COMPLAINT

917346.1

1      4.      Relator be awarded all costs of this action, including attorneys' fees,

2  expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

3      5.      The United States and Relator be granted all such other relief as the

4  Court deems just and proper.

5                          **DEMAND FOR JURY TRIAL**

6      A jury trial is requested for all issues so triable.

7

8  DATED:  April 4, 2014              Respectfully submitted,

9                                     BROWN WHITE & NEWHOUSE LLP

10

11  By    *s/George B. Newhouse, Jr.*
                                          GEORGE B. NEWHOUSE, JR.
12                                         Attorneys for Relator
                                           KARIN BERNTSEN
13

14  DATED:  April 4, 2014              Respectfully submitted,

15                                     JAMES, HOYER, NEWCOMER &

16                                     SMILJANICH P.A.

17

18  By    *s/Elaine Stromgren*
                                          ELAINE STROMGREN
19                                         Attorneys for Relator
                                           KARIN BERNTSEN
20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT

917346.1

**PROOF OF SERVICE**
**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

    I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action.  My business address is 333 South Hope Street, 40th Floor, Los Angeles, California 90071.

    On April 4, 2014, I served the following document(s) described as: **THIRD AMENDED COMPLAINT** _in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

AUSA Howard Daniels
United States Attorney's Office
300 North Los Angeles Street, Rm. 7516
Los Angeles, CA 90012

Vanessa I. Reed
U.S. Department of Justice
Patrick Henry Building
601 D. Street, N.W., Rm. 9542
Washington, D.C. 20004

☒     **BY MAIL:** I deposited such envelope in the mail at 333 South Hope Street, 40th Floor, Los Angeles, California 90071.  The envelope was mailed with postage thereon fully prepaid.  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one (1) day after date of deposit for mailing in affidavit.

☐     **BY FACSIMILE:** I served said document(s) to be transmitted by facsimile pursuant to Rule 2008 of the California Rules of Court.  The telephone number of the sending facsimile machine was 213/613-0550.  The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list.

☐     **BY OVERNIGHT DELIVERY:** I served such envelope or package to be delivered on the same day to an authorized courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier.

☐     **BY HAND DELIVERY:** I caused such envelope(s) to be delivered by hand to the above addressee(s).

☐     **BY ELECTRONIC MAIL:** On the above-mentioned date, from Los Angeles, California, I caused each such document to be transmitted electronically to the party(ies) at the e-mail address(es) indicated below.  To the best of my knowledge, the transmission was reported as complete, and no error was reported that the electronic transmission was not completed.

☒     **FEDERAL:** I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on April 4, 2014, at Los Angeles, California.

Letty Perez

917346.1