1    Stephen G. Larson (SBN 145225)
     *slarson@larsonobrienlaw.com*
2    Melissa A. Meister (SBN 296744)
     *mmeister@larsonobrienlaw.com*
3    Kelly R. Graf (SBN 301325)
     *kgraf@larsonobrienlaw.com*
4    LARSON O'BRIEN LLP
     555 S. Flower Street, Suite 4400
5    Los Angeles, CA  90071
     Tel:  213-436-4888
6    Fax:  213-623-2000

7    Elaine Stromgren (SBN 417610)
     *estromgren@jameshoyer.com*
8    Sean P. Keefe (SBN 413828)
     *skeefe@jameshoyer.com*
9    JAMES HOYER, P,A.
     2801 W. Busch Blvd. Suite 200
10   Tampa, FL 33618
     Tel.: 813-375-3700
11   Fax: 813-375-3710
     *Admitted Pro Hac Vice*
12
     Marlan B. Wilbanks (SBN 758223)
13   *mbw@wilbanksgouinlock.com*
     Susan S. Gouinlock (SBN 303217)
14   *ssg@wilbanksgouinlock.com*
     WILBANKS & GOUINLOCK, LLP
15   Monarch Plaza
     3414 Peachtree Rd., NE, Suite 725
16   Atlanta, Georgia 30326
     Tel.: 404-842-1075
17   Fax: 404-842-0559
     *Admitted Pro Hac Vice*
18
     Attorneys for Relator
19   KARIN BERNTSEN

20

21              **UNITED STATES DISTRICT COURT**

22      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

23   UNITED STATES OF AMERICA *ex*        Case No.  CV 11-08214 PJW
     *rel.* KARIN BERNTSEN,
24                                         **FIFTH AMENDED COMPLAINT**
                        Plaintiff,
25
     v.
26
     PRIME HEALTHCARE SERVICES,            **DEMAND FOR JURY TRIAL**
27   INC.;  ALVARADO HOSPITAL, LLC;
     PRIME HEALTHCARE CENTINELA,
28   LLC; PRIME HEALTHCARE

| | |
|---|---|
| 1 | SERVICES GARDEN GROVE, LLC;<br>PRIME HEALTHCARE | Complaint Filed: June 23, 2016 |
| 2 | HUNTINGTON BEACH, LLC; PRIME<br>HEALTHCARE LA PALMA, LLC; | Trial Date: November 26, 2018 |
| 3 | DESERT VALLEY HOSPITAL, INC.;<br>PRIME HEALTHCARE | |
| 4 | FOUNDATION, INC., F/K/A PHSI<br>FOUNDATION, INC., F/K/A PRIME | |
| 5 | HEALTHCARE SERVICES<br>FOUNDATION, INC.; PRIME | |
| 6 | HEALTHCARE MANAGEMENT,<br>INC., F/K/A PRIME MANAGEMENT | |
| 7 | SERVICES, INC.; PRIME<br>HEALTHCARE SERVICES ENCINO, | |
| 8 | LLC; VERITAS HEALTH SERVICES,<br>INC.; PRIME HEALTHCARE | |
| 9 | SERVICES MONTCLAIR LLC; PRIME<br>HEALTHCARE PARADISE VALLEY, | |
| 10 | LLC; PRIME HEALTHCARE<br>SERVICES SAN DIMAS, LLC; PRIME | |
| 11 | HEALTHCARE SERVICES SHASTA,<br>LLC; PRIME HEALTHCARE | |
| 12 | SERVICES - SHERMAN OAKS, LLC;<br>PRIME HEALTHCARE ANAHEIM, | |
| 13 | LLC; and DR. PREM REDDY, | |
| 14 | Defendants. | |

This is an action brought by Plaintiff/Relator Karin Berntsen on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.* In support thereof, Relator alleges as follows:

## I.

## <u>INTRODUCTION</u>

1.      Defendants (collectively referred to as "PHS," "Prime," or "Defendants") have defrauded the federal government of millions of dollars by billing for medically unnecessary inpatient short stay admissions which should have been classified as outpatient/observation cases.  PHS's behavior is particularly egregious because in an effort to receive greater reimbursement from Medicare and other government healthcare programs, PHS has explicitly instructed its physicians and hospital staff to disregard the Medicare guidelines and to choose inpatient

2

admission over outpatient/observation status in almost every instance, regardless of whether the criteria for inpatient admission has been satisfied.

2.      PHS also wrongfully increases the MS-DRG payments it receives from Medicare through upcoding by falsifying information concerning the complications and comorbidities associated with patients' diagnoses.

3.      In addition, PHS unlawfully refuses to discharge patients who are eligible to be transferred for post-acute care.

4.      As a result, PHS compromises the well-being of its patients and fraudulently increases its payments from Medicare and other government healthcare programs.

## II.

## <u>JURISDICTION AND VENUE</u>

5.      This action arises under the False Claims Act, 31 U.S.C. §§ 3729 – 3732.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

6.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because at least one of the Defendants can be found in, resides in, transacts business in and has committed the alleged acts in the Central District of California.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in and transacts business in the Central District of California, and many of the alleged acts occurred in this District.

8.      Relator is an original source as defined by the False Claims Act in 31 U.S.C. § 3730(e)(4)(B) and Relator has made voluntary disclosures to the United States prior to the filing of this lawsuit.

### III.

### PARTIES

9.      Relator Karin Berntsen has been employed at Defendant Alvarado Hospital—first as the Director of Quality and Risk Management and then as the Director of Case Management.  In February 2013, she became the Director of Performance Improvement (PI).  Relator is a registered nurse with more than twenty-years of experience in healthcare leadership and patient care positions.  She has published two books regarding patient safety matters.  From 2003 to 2005, she was the Director of Nursing for the County of San Diego, CA.

10.      The Prime healthcare system comprises a variety of private corporate entities that are owned and controlled by defendant Prem Reddy, M.D. (Reddy) and/or trusts established for the benefit of Reddy and his family, including defendant Prime Healthcare Services, Inc. (PHS), defendant Prime Healthcare Foundation, Inc., f/k/a PHSI Foundation, Inc., f/k/a Prime Healthcare Services Foundation, Inc. (Foundation), defendant Prime Healthcare Management, Inc., f/k/a Prime Management Services, Inc. (Management Company), and individual hospitals throughout the United States. PHS is a for-profit California corporation founded by Reddy in or around 2001.  The Foundation is a not-for-profit California corporation founded by Reddy in or around 2007.  Both entities are incorporated in Delaware and located at 3300 East Guasti Road, Ontario, California, 91761.  At all times relevant to this action, Reddy was the Chairman, President, and Chief Executive Officer of PHS and the Foundation.  The Management Company is a for-profit California corporation founded by Reddy in or around 2004.  Like PHS and the Foundation, it is incorporated in Delaware and located at 3300 East Guasti Road, Ontario, California, 91761.  At all times relevant to this action, Reddy was the President of the Management Company, which provides management, consulting, and support services to hospitals owned and operated by PHS and the Foundation.    PHS began its strategy of acquiring hospitals in financial distress

4

with its 2004 purchase of Chino Valley Medical Center, which was in Chapter 11 bankruptcy.  PHS incorporates a model of educating doctors in the financial aspects of medicine to change distressed hospitals into financially stable businesses. Through its wholly-owned subsidiaries, Prime now owns and operates fourteen hospitals in the state of California.  The Defendant hospitals are:

    a.  Alvarado Hospital Medical Center, located in San Diego, CA – Alvarado Hospital, LLC

    b.  Centinela Hospital Medical Center, located in Inglewood, CA – Prime Healthcare Centinela, LLC

    c.  Chino Valley Medical Center, located in Chino, CA – Veritas Health Services, Inc.

    d.  Desert Valley Hospital, located in Victorville, CA – Desert Valley Hospital, Inc.

    e.  Encino Hospital Medical Center, located in Encino, CA – Prime Healthcare Services Foundation, Inc. and Prime Healthcare Services Encino, LLC

    f.  Garden Grove Hospital Medical Center, located in Garden Grove, CA – Prime Healthcare Services Garden Grove, LLC

    g.  Huntington Beach Hospital, located in Huntington Beach, CA – Prime Healthcare Huntington Beach, LLC

    h.  La Palma Intercommunity Hospital, located in La Palma, CA – Prime Healthcare La Palma, LLC

    i.  Montclair Hospital Medical Center, located in Montclair, CA – formerly Prime Healthcare Services III, LLC; presently Prime Healthcare Services Foundation, Inc. and Prime Healthcare Services Montclair, LLC

    j.  Paradise Valley Hospital, located in National City, CA – Prime Healthcare Paradise Valley, LLC

5

k.  San Dimas Community Hospital, located in San Dimas, CA – Prime
Healthcare Services San Dimas, LLC

l.  Shasta Regional Medical Center, located in Redding, CA – Prime
Healthcare Services Shasta, LLC

m. Sherman Oaks Hospital, located in Sherman Oaks, CA – Prime
Healthcare Services – Sherman Oaks, LLC

n.  West Anaheim Medical Center, located in Anaheim, CA – Prime
Healthcare Anaheim, LLC

11.     Prime Healthcare Services Foundation, Inc., d/b/a Encino Hospital
Medical Center and Montclair Hospital Medical Center, ("PHSF") is a Delaware
corporation with its primary place of business at 3300 East Guasti Road, 2nd Floor,
Ontario, California, 91761.  A wholly owned and operated subsidiary of PHS,
PHSF was founded by a $1 million donation from Dr. Prem Reddy.  Encino
Hospital Medical Center and Montclair Hospital Medical Center were donated to
PHSF by PHS in 2009 and 2011, respectively.  PHSF is a 501(c)(3) charitable
organization.

12.     Defendant Prime Healthcare Foundation, Inc., f/k/a PHSI Foundation,
Inc., f/k/a Prime Healthcare Services Foundation, Inc. (Foundation)is an entity
affiliated with Reddy and PHS.  PHS has transferred ownership to the Foundation
of certain hospitals that it owned.  The Foundation currently owns and operates four
acute care hospitals in California (Sherman Oaks, Montclair, Huntington Beach,
and Encino) that are part of the Prime healthcare system. .

13.     Dr. Prem Reddy is the founder and Chairman of the Board of Prime
Healthcare Services, Inc.  Reddy actively oversees the acquisition and restructuring
of all new hospitals acquired by PHS, including implementing uniform protocols at
all PHS facilities.

14.     Dr. Luis Leon is the regional CEO for Alvarado Hospital Medical
Center and Paradise Valley Hospital.  Leon was made regional CEO after the

6

former CEO of Alvarado Hospital Medical Center resigned when the hospital was acquired by PHS.

## IV.

## REGULATORY OVERVIEW

### A.   Inpatient Short Stay Hospital Admissions

15.     In an effort to combat Medicare fraud and abuse, The Centers for Medicare and Medicaid Services (CMS) has increased scrutiny of the medical necessity for short-stay inpatient hospital admissions.  Due to the greater reimbursement for inpatient services versus observation services, the Government requires strict adherence to inpatient admission rules.

16.     Chapter 6, Section 6.5.2 of the Medicare Program Integrity Manual states that,

> Inpatient hospital care must be medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay.  The beneficiary must demonstrate signs and/or symptoms severe enough to warrant the need for medical care and must receive services of such intensity that they can be furnished safely and effectively only on an inpatient basis.

It further provides that "factors that may result in an inconvenience to a beneficiary or family do not, by themselves, justify inpatient admission." *Id.*  Inpatient care is only required if the beneficiary's medical condition, safety, or health would be significantly and directly threatened if care were to be provided in a less intensive setting. *Id.*

17.     Chapter 1, Section 10 of the Medicare Benefit Policy Manual sets forth the following factors that should be considered by the physician when deciding whether to admit a patient as an inpatient: the severity of the signs and symptoms exhibited by the patient; the medical predictability of something adverse happening to the patient; the need for diagnostic studies that appropriately are outpatient services; and the availability of diagnostic procedures at the time.

7

18.     Short stay hospital stays have not only appeared on the OIG Work Plan but have also been a focus of Medicare's Program for Evaluating Payment Patterns Electronic Reports (PEPPER reports).  Many hospitals use decision support system tools such as InterQual to assist them in the inpatient admission versus outpatient/observation status decision making process.

19.     Hospitals are reimbursed by Medicare for the services they provide to inpatients on the basis of diagnosis related groups (DRGs) and to outpatients on the basis of Ambulatory Payment Classifications (APCs).  On average, Medicare pays approximately $4,500 to $5,000 more for a DRG than for an APC with its bundled observation fee.

**B.     Utilization Review is a Federally Mandated Requirement for Hospitals**

20.     Hospitals must have in effect a Utilization Review (UR) plan that provides for review of services furnished by the institution and by members of the medical staff to patients entitled to benefits under the Medicare and Medicaid programs.  The UR plan must provide for review for Medicare and Medicaid patients with respect to the medical necessity of (i) admissions to the institution; (ii) the duration of stays; and (iii) professional services furnished, including drugs and biological. 42 CFR § 482.30.

**C.     Medical Severity – Diagnostic Related Groups under the Medicare Inpatient Prospective Payment System**

21.     Hospitals such as the PHS Defendants are reimbursed for their inpatient services under the Medicare Inpatient Prospective Payment System (IPPS).  Under this system, the ICD-9 Procedure Code and the ICD-9 Diagnostic Code (and in some cases age, sex and demographics) determine the appropriate MS-DRG classification.  ICD-9 procedures will typically be grouped to a MS-DRG classification which indicates: with major complications and comorbidities (MCC); with complications and comorbidities (CC); or without complications and comorbidities (without CC/MCC).

22.     Complications and Comorbidities typically increase the reimbursement rate for an MS-DRG. Thus, patients' complications and comorbidities must be accurately recorded in order to ensure that the hospital is appropriately reimbursed by Medicare.

**D.     Duty to Report and Return Overpayments from Medicare**

23.     The Medicare and Medicaid program integrity provisions, 42 U.S.C. § 1320a-7k(d), state as follows:

**(d) Reporting and returning of overpayments**

**(1) In general**

If a person has received an overpayment, the person shall –

(A) report and return the overpayment to the Secretary, the State, an intermediary, a carrier, or a contractor, as appropriate, at the correct address; and

(B) notify the Secretary, State, intermediary, carrier, or contractor to whom the overpayment was returned in writing of the reason for the overpayment.

**(2) Deadline for reporting and returning overpayments**

An overpayment must be reported and returned under paragraph (1) by the later of --

(A) the date which is 60 days after the date on which the overpayment was identified; or

(B) the date any corresponding cost report is due, if applicable.

**(3) Enforcement**

Any overpayment retained by a person after the deadline for reporting and returning the overpayment under paragraph (2) is an obligation (as defined in section 3729(b)(3) of title 31) for purposes of section 3729 of such title.

9

## V.

## FACTUAL ALLEGATIONS

**A.**     **False Claims Act violations resulting from improper inpatient hospital admissions and fraudulent claims for DRG payments based on upcoding**

24.     In November 2010, Defendant Prime Healthcare Services purchased Alvarado Hospital.  Subsequent to the purchase, Alvarado's entire executive team, including the CEO Harris Koenig, resigned and Dr. Luis Leon was installed as the Regional CEO overseeing Alvarado Hospital.  PHS's Chairman of the Board is Dr. Prem Reddy whose medical specialties are internal medicine and cardiology.

25.     Approximately seventy-percent of Alvarado Hospital's patients are covered by Medicare and other federal healthcare programs.  Approximately twenty-percent are covered by Medicaid. The vast majority of Alvarado's patients are initially treated at the hospital's emergency room where a determination is made by attending physicians as to whether the patient should be placed under observation or admitted as an inpatient.

26.     Prior to PHS's takeover of Alvarado, Relator, as the Director of Quality and Risk Management, in conjunction with the then in-place executive team, implemented a number of controls to preclude abuse of Medicare regulations regarding short stay inpatient hospital stays.  These controls augmented the McKesson Company, InterQual decision support computer program then in use at Alvarado.  Statistical reviews conducted subsequent to the implementation of Relator's procedures confirmed Alvarado's one-day stay admissions were well within accepted norms.

27.     In December 2010, after the takeover by PHS, a meeting was held during which the former Chief Operating Officer, Darlene Wetton, informed the Medical Staff Department of Medicine Committee that PHS does not do observation, but admits all patients as inpatients.  Thomas Young, MD the immediate past chief of the Department of Medicine conveyed to Ms. Wetton that

10

he strongly disagreed with PHS's directive not to use observation status and that he personally would continue to identify observation patients when appropriate.  Ms. Wetton resigned before the end of January 2011.

28.    Also discussed at the December 2010 meeting were the new chest pain pre-printed order sets.  After the takeover, PHS replaced the chest pain order forms currently in use at Alvarado with new forms that no longer included a check-off to select observation status as an option for site of service.  The Medical Executive Committee in a memo dated December 8, 2010 to the Alvarado Hospital Governing Board (of which Dr. Prem Reddy was the Chairman) made a formal request to restore a check-off for observation to the new order sets. Despite this request, the check-off for observation was not added back on to the forms.  The memo also stated that these "new order sets are used throughout the Prime Healthcare system." The "Forms Fast" system is the name of the computer system used by PHS to generate forms for all of the hospitals it owns and operates.

29.    In January 2011, more than 250 employees, including most of Alvarado Hospital's Quality and Risk Management Department staff were dismissed by PHS.  At about the same time, Dr. Reddy implemented a monthly Hospitalist Meeting attended by the senior and high-volume admitting physicians as well as key administrators.  The first such meeting was convened on February 1, 2011 at which time Dr. Reddy startled those present by stating, "We don't do observation.  All patients should be inpatient.  You can always find a reason to make the patient an inpatient."

30.    Dr. Reddy reiterated his instructions concerning inpatient admissions at subsequent Hospitalist meetings attended by Relator, including a meeting on May 3, 2011 at which he also encouraged those present to upcode by adding complications or comorbidities such as encephalopathy and fecal impaction to a diagnosis in order to increase the DRG reimbursement rate.  For example, he stated:

"If the patient is elderly, you should add encephalopathy for a higher payment.  You are missing some of these elderly patients.  But, be careful . . . I don't want to go to jail, ha, ha, ha."

"If you code fecal impaction in GI bleed diagnoses, I can get $3,000 more per case."

"If the patient leaves against medical advice you are free to document whatever conditions you want."

31.     Dr. Reddy's instructions to upcode by exaggerating complications or comorbidities (CCs or MCCs) also resulted in increases in improper diagnoses of conditions including, but not limited to, septicemia, malnutrition, acute heart failure, and autonomic nerve disorders.  At a December 13, 2013 meeting, detailed *infra*, Reddy instructed Prime physicians and administrators to diagnose heart failure as "acute" rather than "chronic" so that hospitals could receive higher reimbursement amounts.  Reddy specifically told Dr. Larry Emdur that "you cannot admit a patient for chronic systolic heart failure.  It has to be acute."

32.     Within weeks of Alvarado's purchase, the coding manager, Joseph Ingranda resigned.  Subsequent to the February 1, 2011 meeting, Relator was told by a hospital coder, that the coder was instructed to make no coding distinction between atrial fibrillation and atrial flutter, but rather to code at the highest paying DRG.  That coder resigned shortly thereafter as did her supervisor, Lori Cardle, vice-president of Revenue Cycle.

33.     At the August 23, 2011 Case Management meeting, Dr. Leon confirmed the previous statements regarding patient observation status and specifically instructed that the Case Management Department no longer be involved in the process of assisting with the identification of observation status and that the use of the InterQual system to evaluate observation status be discontinued.

34.     By prohibiting the Case Managers from being involved in and from reviewing the decisions regarding inpatient admissions, PHS was in direct violation

12

of the CMS requirement that a hospital must have in effect a utilization review
(UR) plan that must provide for review of Medicare and Medicaid patients with
respect to the medical necessity of admissions to the institution.  42 CFR § 482.30.
Prohibition of effective utilization review with regard to inpatient admissions was
one of the ways in which PHS was able to carry out and intentionally disguise its
fraudulent scheme of improperly admitting individuals as inpatients who did not
meet medical necessity for inpatient admission as opposed to placing them in
observation.

35.    Prior to the August 23, 2011 Case Management meeting, Dr. Leon
instructed Dr. Larry Emdur, a lead physician, to designate one out of five chest pain
patients for observation status in an apparent effort to make it more difficult for
auditors to detect PHS's deliberate practice of under-identifying observation status.
Nevertheless, the Program for Evaluating Payment Pattern Electronic Report
(PEPPER) for Alvarado began to reflect an inordinate increase in one-day stays,
respiratory infection diagnoses, septicemia infection diagnoses and other anomalies.

36.    When Relator discussed her concerns regarding the observation status
changes with Dr. Leon, he informed her that observation billing was his
responsibility and if Medicare comes after him, he will "throw his group of lawyers
at them."

37.    At a September 2, 2011 meeting called by Dr. Leon, he instructed the
Emergency Department manager, Tammy Russell, to eliminate references to
observation status on hospital admission forms.  Later in that meeting, Ms. Russell
mentioned that a new ER doctor, Donald R. Sallee identified six observation status
patients on the night of September 1-2, provoking Dr. Leon to comment: "Six!  Six
observation patients in one night!  That is not right.  We should do six observation
patients in one year!"  He then instructed Ms. Russell to provide him the medical
files of those patients and, after commenting, "These new ER doctors need to be

13

trained," instructed Ms. Russell to summon Dr. Sallee to a subsequent private meeting.

38.     Relator was present at several hospitalist meetings where Reddy directly and clearly instructed internal medicine physicians, known as the Emergency Associate (EA) group, to not admit chest pain patients as outpatients, but instead to find a reason to admit them as inpatients because the Medicare payments are much higher for inpatients.

39.     In addition to the ER physicians, hospitalists, and case managers, Reddy also pressured the clinical documentation information specialists (CDIs) to engage in fraudulent conduct in order to increase inpatient admissions and DRG reimbursements. For example, the CDIs were trained to exaggerate patients' conditions on the query form in order to justify admitting them as inpatients or to increase the DRG reimbursements even though the information on the query form was not supported by the patients' medical records.  Due to time constraints, many physicians, especially the hospitalists, do not independently verify that the conditions on the query forms are accurate and supported by the medical records. Thus, the false information intentionally supplied by the CDIs in many instances results in medically unnecessary inpatient admissions and/or upcoding because the complications and comorbidities associated with patients' diagnoses have been falsified.

40.     As an instructional exercise regarding enhanced reimbursement coding at the September 6, 2011 Hospitalist Meeting, Dr. Reddy personally reviewed and manually altered patient records without consulting treating physicians.  He thereafter handed the records to Dr. Leon who reviewed the changes.  In turn, Dr. Leon handed them to Marianna Martinez, Director of Health Information Systems to effect the changes.  At this same meeting, Dr. Manorama Reddy said to Dr. Prem Reddy, "We are not using observation like you told us, and almost all patients are admitted as inpatients."  Dr. Reddy nodded affirmatively to Dr. Manorama Reddy

14

1   when she made this statement.

2       41.   On November 14, 2011 at 12:30 p.m., Relator attended a hospitalist

3   meeting conducted by Reddy.  During the meeting, Reddy reviewed patient specific

4   information and identified numerous examples in which he thought a CC

5   (complication or comorbidity) or an MCC (major complication or comorbidity)

6   should have been added (even though Reddy had never seen or treated these

7   patients).  One of the cases Reddy discussed involved a patient treated by Dr.

8   Fredrick Howden, a cardio-thoracic surgeon who was not present at the meeting.

9   Reddy stated that "he could get $25,000 without a CC or MCC, but he could get

10  $50,000 with a CC or MCC." Reddy commented that due to the length of time the

11  patient had been in the hospital "there must be a CC or MCC."  Relator was

12  concerned by the fact that Reddy was instructing that a CC or MCC be added to

13  increase reimbursement even though he had never identified a basis in the medical

14  record to support the addition of a CC or MCC.

15      42.   Also at this November meeting, Reddy told the physicians present that

16  they "should not use syncope because it is not enough to get a DRG." He explained

17  that they should use another diagnosis so that the more lucrative DRG

18  reimbursement for an inpatient admission could be received as opposed to the lesser

19  observation outpatient reimbursement rate. He then stated that complications (CCs

20  or MCCs) needed to be added for chest pain patients as well. Dr. Reddy continued

21  to review records with Dr. Emdur denoting changes that could be made to those

22  records.

23      43.   On April 23, 2012, Relator reported her concerns about PHS's

24  improper practices to CFO Brian Kleven. Mr. Kleven stated that he had been at the

25  meetings in which Reddy told the doctors not to do observation. Mr. Kleven also

26  stated he and Relator had to support Reddy and Prime, and help cover for Dr.

27  Reddy.  Relator was dismayed at Mr. Kleven's response to her concerns and that he

28  had suggested helping to "cover up" Reddy's improper practices.

15

44.     PHS's fraudulent activities described above are ongoing.  PHS continues to engage in upcoding, falsifying diagnoses, and improper inpatient admissions.

45.     Relator estimates that PHS Alvarado's fraudulent short-stay inpatient admission billings to government healthcare programs exceed $8 million. Considering Alvarado is a typical hospital within the PHS system and that some of those hospitals have been within the PHS system for at least six years, Relator conservatively estimates that PHS's false billings just with regard to improper short-stay inpatient admissions alone exceeds $50 million.

46.     In addition to the damages described above due to PHS's inpatient admissions which did not meet inpatient criteria, PHS is also liable for damages due to Medicare payments it received for inpatient admissions made during the time period during which it was refusing to perform its federally mandated utilization review functions.  PHS's decision to not have an effective utilization review process as required by law tainted all of its hospitals' inpatient admission decisions because these admissions were not subject to any form of review to ensure the medical necessity of admissions to the institution. John Marino, M.D., the Medical Director of Utilization Review, complained to hospital management regarding PHS's practices with regard to improper inpatient admissions.

47.     Alvarado Hospital continued the practice of prohibiting UR until approximately May of 2012 when CFO Brian Kleven decided that failing to perform UR functions was too risky for the hospital from a liability standpoint.  Mr. Kleven was also concerned that Medicare would cease to reimburse Alvarado for inpatient admissions if Medicare learned that Alvarado was in violation of its obligation to implement an effective UR. Even though Alvarado Hospital eventually resumed UR, other PHS hospitals have continued to prohibit UR with regard to inpatient admissions.  Furthermore, despite the reimplementation of UR at

16

Alvarado, the billing for fraudulent short-stay inpatient admissions at Alvarado continued.

48.     Defendants' fraudulent activities described above have caused the submission of false or fraudulent claims for payment which have caused monetary damages to the government.  In addition, the fraudulent conduct has resulted in Defendants knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. Defendants, due to fraudulent activities such as improper inpatient admissions, upcoding, and falsifying complications, have received overpayments from Medicare and have failed to report and return them within the time periods specified in 42 U.S.C. § 1320a-7k(d)(2).

**B.     Evidence of Fraud throughout Prime Healthcare System**

49.     Relator has specific evidence that the fraudulent activities alleged in the Complaint are occurring throughout the Prime Healthcare system, including each of the Defendant PHS hospitals.

50.     As identified in this Complaint, Relator has attended numerous meetings in which Defendant Reddy has issued system-wide instructions to engage in improprieties which result in upcoding and medically unnecessary inpatient admissions. Almost every time Reddy has issued these instructions or addressed these issues, he has spoken in terms of the entire Prime healthcare system.  Even when these meetings took place at Alvarado hospital, Reddy's comments would almost never be limited to Alvarado; rather, he would emphasize that the procedures he was encouraging should be, and were being, used at the other PHS hospitals.

51.     When discussing coding, billing, and other hospital procedures in the context of inpatient admissions and/or increased DRG payments, including during the meetings identified in the Complaint, Reddy has made numerous comments, in the presence of Relator, indicating that the practices are system-wide including:

17

"This is the way we do things at **Prime**" and "**We** don't do observation . . . you can always find a reason to make the patient an inpatient."  Furthermore, Reddy is conducting these same meetings (especially hospitalist meetings) at the other Defendant PHS hospitals in which he specifically directs individuals to engage in conduct which causes upcoding and medically unnecessary inpatient admissions. At hospitals, such as Defendant Paradise Valley Hospital, Reddy for several years even conducted the hospitalist meetings on a weekly basis.

52.    At a December 13, 2013 meeting conducted by Reddy, Relator heard Reddy state "We have in every hospital the same thing . . . We have now twenty-five hospitals testing it . . . that's what the advantage of having that kind of information from various hospitals so somebody's not in silo in one hospital."

53.    Relator has direct knowledge that other Prime hospitals are engaging in the same fraudulent behavior as Alvarado, not only because she has personally heard Reddy's statements about the commonality of the practices throughout the Prime Healthcare system, but also because of her interactions (during the course of her professional responsibilities) with employees from other Prime hospitals. For example, on October 10, 2012, Relator as well as Prime case managers, clinical documentation improvement specialists (CDIs), and social workers, participated in an on-line training webinar conducted by Milliman dealing with medical necessity guidelines.  Two of the participants, (Ann Davis, a social worker, and Desiree Hawkins, Director of Case Management) were representatives of the Defendant PHS hospital known as San Dimas Hospital; during the webinar, one of these individuals stated: "We don't do observation. The higher-ups want us to admit all patients as inpatients." None of the participants contradicted this statement.

54.    Relator has also had conversations with representatives from Defendant Paradise Valley Hospital.  Janice Bowman, the Director of Case Management at Paradise Valley, specifically told relator "we don't do observation." Neerav Jadeja, a Paradise Valley Administrator, was present at the December 13,

18

1   2013 meeting (discussed below in Section E of the Complaint) during which Reddy
2   encouraged upcoding in order to increase MS-DRG reimbursements received by
3   Prime.

4         55.    Defendant Dr. Luis Leon, who is Reddy's "right hand man," is the
5   CEO of both PHS's Alvarado and Paradise Valley hospitals. Dr. Leon, as described
6   in detail herein, has been instrumental in ensuring that Reddy's directives are
7   implemented in these hospitals. Dr. Leon attended the hospitalist meetings directed
8   by Reddy himself.  Dr. Leon also regularly attended the case management
9   meetings.

10         56.    During the course of her professional duties, Relator has also reviewed
11   Program for Evaluating Payment Patterns Electronic Reports (PEPPER reports) for
12   at least four Defendant PHS hospitals, including Alvarado and Paradise Valley
13   hospitals.  These PEPPER reports all demonstrated a similar trend, specifically a
14   significant increase in one-day stay inpatient admissions after PHS took over the
15   hospitals.  These reports were also discussed at a case management committee
16   meeting which Relator attended.

17         57.    Evidence of Prime's system-wide fraud also stems from the fact that
18   several PHS hospitals contract with Emergency Medical Associates (EMA) to
19   provide ER physicians to service Prime Healthcare's Emergency Departments.
20   Thus, Alvarado shares its ER doctors with other PHS hospitals including Centinela
21   Hospital Medical Center, Chino Valley Medical Center, Encino Hospital Medical
22   Center, Huntington Beach Hospital, La Palma Intercommunity Hospital, Montclair
23   Hospital Medical Center, Sherman Oaks Hospital and San Dimas Community
24   Hospital.

25         58.    Therefore, when Relator, at several of the meetings she attended,
26   witnessed Reddy issue instructions for ER doctors regarding the prohibition against
27   observation services, those instructions pertained to ER doctors who practice at all
28   of the hospitals listed above – not just Alvarado Hospital. For example, at a

19

September 2011 meeting, Dr. Reddy instructed Dr. Leon to inform Dr. Mark Bell (the medical director of EMA for all of the PHS hospitals contracted with EMA) that "Prime does not do observation" and that Dr. Bell should train his ER doctors to avoid observation at Prime hospitals.

59.    In addition, Dr. Kevin Kelly, the medical director of EMA for Alvarado hospital, was in attendance at most of the meetings in which Dr. Reddy and/or Dr. Leon encouraged upcoding and prohibited observation. Dr. Kelly complained to Relator about Dr. Reddy's directives to avoid using observation. At a case management committee meeting on January 24, 2012, Dr. Kelly acknowledged that "Prime corporate" had ordered him to remove "observation" from the Emergency Services-Holding Orders and that observation was no longer an option on these orders.

60.    As part of her job responsibilities, Relator reviews claims before and after they are submitted and reimbursed by Medicare.  The billings that she has reviewed from Alvarado are typical of billings submitted and reimbursed by the other Defendant Prime hospitals because billing for all PHS hospitals is centralized at PHS's Ontario headquarters. In addition, Dr. Reddy personally reviews and, if necessary, modifies Medicare billings prior to submission to government healthcare programs for all of the Defendant hospitals.

61.    The billing system is not the only system that is standardized throughout PHS.  PHS also uses mostly the same forms for all of its hospitals.  For example, the December 8, 2010 memo from the Medical Executive Committee to the Alvarado Hospital Governing Board stated that the new order sets (without the observation check-off) are "used throughout the Prime Healthcare system." The "Forms Fast" system is the name of the computer system used by PHS to generate forms for the hospitals it owns and operates.  Using forms without the observation check-off option is another method by which PHS advanced its fraudulent scheme of admitting patients when they should have been placed in observation.

20

Furthermore, a PHS corporate representative named Ann Abe, who was the Systems Director for the entire Prime Healthcare system, indicated that she was aware that the observation option had been eliminated from the PHS forms.

62.     Another example of Prime's use of standardized practices is evidenced in an email dated October 13, 2011 from Shirlee Meadows, Director of Admitting, which describes how earlier that year she had been instructed by April Jones, a representative from Prime corporate management, to stop presenting the Medicare Outpatient Observation Status form (OBS letter) to patients since "this is not a prime standard." Ms. Meadows also stated, "When we went live on Forms Fast we requested that the OBS letter be put in but we were told no."

63.     Dr. Krishna P. Surapaneni, a vendor with MedWrite Biz for Defendant PHS' hospitals, commented to Relator, "PHS does not do observations" Dr. Krishna's comment is further evidence that Reddy has ensured that the Defendant PHS hospitals are engaging in a system-wide scheme to increase Medicare reimbursements through upcoding and fraudulent inpatient admissions.

64.     As described above, Reddy has created a corporate-wide culture of fraudulent behavior which permeates all of the Defendant PHS hospitals at all levels.  Reddy has pressured and trained individuals, including corporate administrators, ER physicians, hospitalist physicians, case managers, and CDIs to engage in fraud in order to increase the payments PHS receives from Medicare. Furthermore, Relator has personally witnessed Reddy engage in this behavior and has seen first-hand the harmful consequences to patients and to the Medicare program as a result of this fraud.

## C.     Relator is an original source under 31 U.S.C. § 3730(e)

65.     Relator is an "original source" under 31 U.S.C. § 3730(e).  Before the filing of this action, Relator made voluntary disclosures to the government.

66.     Relator has independent, first-hand knowledge of the fraud she has alleged against all of the Defendant PHS Hospitals. As specifically addressed

throughout the Complaint and in detail in paragraphs 49-64, Relator's personal knowledge and evidence of upcoding and fraudulent inpatient admissions is not just limited to Alvarado Hospital.  Rather, she has evidence that the fraudulent conduct is occurring throughout the Prime Healthcare System. In addition, Relator, due to her professional responsibilities, has specific knowledge that PHS is submitting and causing to be submitted to Medicare false claims for payment due to upcoding and medically unnecessary inpatient admissions, and that Medicare, unaware of the fraud, has reimbursed PHS for these claims.

67.     A substantial portion of Relator's knowledge comes from meetings identified herein that she personally attended, including those in which Defendant Reddy discussed the improper protocol for inpatient admission versus observation status and methods to increase DRG reimbursements within the Prime hospital system. The information from these meetings that Relator has provided to the government was not publically disclosed at the time Relator provided the information to the government or at the time she filed her complaint.

68.     In addition, in the course of her professional responsibilities, Relator has access to PHS's billing information and daily patient census, which allows her to view patient-specific information concerning dates of admission, diagnoses, names of treating physicians, and DRG billing and reimbursement data. Furthermore, as explained above, the billing for Alvarado hospital, as well as all PHS hospitals, is uniform and centralized at PHS's Ontario, California headquarters.

69.     Relator, as detailed above, as part of her job responsibilities personally attends PHS meetings and interacts with PHS employees outside of Alvarado hospital, including PHS corporate officials. For example, on July 6, 2012, Relator traveled to PHS headquarters in Ontario, California for a corporate meeting attended by PHS corporate representatives, including Suzanne Richards (Vice–president of clinical operations) and Ann Abe (Systems Director for Prime).

22

70.    Relator's personal knowledge is not limited to her experiences at Alvarado hospital. Relator is an "original source" with regard to her allegations against all of the Defendants.

**D.    Specific Instances of Fraudulent Inpatient Hospital Admissions**

71.    Relator has evidence of specific instances in which PHS has wrongfully admitted Medicare patients to the hospital as inpatients when they should have been placed under observation instead.  The patients in the chart below were admitted to Alvarado Hospital as inpatients even though the medical necessity for an inpatient admission had not been satisfied.  In each of these patient-specific examples, PHS unlawfully submitted claims to Medicare, which the government reimbursed.  Had CMS known of the falsity of these claims, it would not have paid them.

| Patient | Date | Inpatient Diagnosis | Findings | DRGs Submitted and Reimbursed | Physician's Initials |
|---------|------|--------------------|----------|-------------------------------|----------------------|
| A | 9/11/2011 | Chest Pain | 12 lead ECG normal Troponins normal | 392 Esoph, Gast & Misc Dig Disorder | LP |
| B | 9/16/2011 | Chest Pain | 12 lead ECG normal Troponins normal | 313 Chest Pain | HT |
| C | 9/11/2011 | Dizziness | 12 lead ECG normal CBC/Chemistry normal | 074 Cran & oerif Nerv Dis | RE |
| D | 8/1/2011 | Chest Pain | 12 lead ECG normal Troponins normal | 313 Chest Pain | RE |

23

72.     Relator has evidence of several additional instances of fraudulent inpatient admissions which are not represented in the above chart but have been provided to the government in the disclosure materials.

**E.      Additional examples of fraudulent claims for DRG payments resulting from unlawful upcoding**

73.     On December 13, 2013, Relator attended a meeting conducted by Defendant Reddy where Reddy instructed Prime physicians and administrators on how to unlawfully upcode certain medical diagnoses in order to maximize Medicare reimbursement.  At this meeting, Reddy explained how to change medical records of patients after the attending physicians complete their diagnoses.   At no time did Defendant Reddy personally provide clinical evaluation of any of these patients. In fact, most of these patients already had been discharged from the hospital at the time their medical records were being altered.

74.     At this meeting, Defendant Reddy repeatedly stated that the policy of intentionally misrepresenting diagnoses is implemented throughout all hospitals within PHS.  As a result of this widespread practice of upcoding, Reddy is orchestrating the inflation of the MS-DRG weight from Non-Complicating or Comorbid Conditions to Major Complicating or Comorbid Conditions, resulting in higher weighted payments from Medicare.  This illegal and systemic practice also compromises patient safety by causing unnecessary and inappropriate medical services to be performed on patients.

75.     For example, Defendant Reddy instructed Prime physicians and administrators to diagnose patients with aspiration pneumonia even though a much higher percentage of pneumonia cases are healthcare acquired pneumonia. Specifically, while examining a patient's record, Reddy stated "[T]his patient is a pneumonia patient, but when they have pneumonia in elderly, write 'possible aspiration pneumonia.'  That is a higher weight."  Reddy then went on to criticize the treating physicians for prescribing drugs such as Vancomycin (even though

Vancomycin is the proper drug for treatment of healthcare acquired pneumonia – the condition with which most of these patients were originally diagnosed by their treating physicians).  Reddy further suggested that with regard to a specific pneumonia patient, additional descriptions and conditions including "confused, elderly, ischemia, and failure to thrive" should be added to the patient's records even though he had never seen the patient.

76.    During this meeting, Reddy was critical of certain doctors who were correctly diagnosing patients.  Reddy attempted to intimidate those doctors into following his directives by belittling them as "dwarves."  At one point, Reddy referred to a well-respected physician, Alvarado's Infectious Disease Specialist, Dr. Butera, as "old fashioned" for prescribing Vancomycin and directed other physicians to "educate" Dr. Butera.

77.    Generally, about 3% of pneumonias are aspiration, and according to the 2013 coding data, the reimbursement rate for aspiration pneumonia (MS-DRG 177) is $11,302, while the reimbursement rate of simple healthcare acquired pneumonia (MS-DRG 179) is only $5,389.   Additionally, Defendants' practice endangers pneumonia patients because they are treated with inappropriate and medically unnecessary drugs, rather than with the medications normally used to treat simple pneumonia, such as Vancomycin.

78.    At this meeting, Defendant Reddy further directed physicians to upcode "pre-renal" conditions as Vasomotor Nephropathy ("VMN").  Current Medicare coding guidelines state that VMN is renal failure, and not a "pre-renal" condition.  Defendant Reddy further instructed PHS's Emergency Department physicians to diagnose all elderly patients with any evidence of dehydration or confusion as suffering from encephalopathy or possible encephalopathy.

79.    As a result of these practices, Reddy is elevating the MS-DRG weight from Non-Complicating or Comorbid Conditions to Major Complicating or Comorbid Conditions, resulting in the submission of fraudulent claims for the

1  purpose of generating excessive Medicare reimbursements and overpayments.

2          80.    Also during the December 13, 2013 meeting, Defendant Reddy

3  repeatedly instructed physicians to insert the word "possible" before several

4  diagnoses in order to receive a higher reimbursement.  According to the ICD-10-

5  CM Official Guidelines for Coding and Reporting (2013) "If the diagnosis

6  documented at the time of discharge is qualified as 'probable', 'suspected', 'likely',

7  'questionable', 'possible' or 'still to be ruled out', or other similar terms indicating

8  uncertainty, code the condition as if it existed or was established."

9          81.    Defendant Reddy instructed Emergency Room physicians to "set the

10  stage for other doctors" knowing that the "possible" diagnosis was unlikely to be

11  eliminated by a subsequent physician.  Defendant Reddy repeatedly stated "possible

12  this, possible that, possible this" as the Prime method for describing patient

13  diagnoses, even when there was no medical basis for doing so, thereby allowing the

14  coders to use a higher weight MS-DRG.

15          82.    Throughout the meeting, Reddy made several statements indicating

16  that the methods he was describing to increase DRG reimbursements were being

17  used at all the Prime hospitals.

18  **F.     False Claims resulting from refusal to transfer or discharge patients**

19          83.    Hospitals are ordinarily entitled to full DRG payment when patients

20  are discharged to their home following a covered inpatient stay.  However, in

21  certain circumstances involving acute care hospitals, CMS has instituted modified

22  DRG payment policies which result in reduced DRG payments based on length of

23  stay and discharge setting criteria.  CMS instituted these payment policies so that

24  acute care hospitals do not receive full DRG payments for Medicare patients that

25  are discharged early and then admitted for additional medical care in other clinical

26  settings.  These DRGs are referred to as "Transfer DRGs."

27          84.    Transfer DRGs include a reimbursement rate that is lower than full

28  DRG payments, because the acute care hospital is required to split the DRG

1   payment with the provider that treats the patient after discharge.  The reduction in
2   payment follows a formula that depends on the patient's actual length of stay
3   ("LOS") and the geometric mean LOS for that DRG.

4          85.    CMS defines a "transfer" as a discharge of a Medicare eligible hospital
5   inpatient to (a) a non-IPPS hospital or a distinct non-IPPS unit, long-term care
6   hospitals, psychiatric hospitals, and cancer hospitals; (b) a skilled nursing facility;
7   or (c) to a home under a written plan for home health services beginning within
8   three days of discharge.

9          86.    Hospitals are responsible for identifying those discharges to which the
10  post-acute transfer rules apply by reporting the appropriate patient discharge status
11  code.

12         87.    Refusing to discharge patients when appropriate raises numerous
13  patient safety concerns.  Increasing a patient's length of stay, while under certain
14  circumstances medically necessary, nevertheless exposes the patient to a greater
15  risk of experiencing complications such as hospital acquired infections, medical
16  errors and falls.  For this reason, it is not in the patient's best interest to
17  unnecessarily extend his/her length of stay, especially when the treating physician
18  has determined that treatment in an acute care hospital is no longer medically
19  necessary.  Unfortunately, improperly extending patients' lengths of stay is the
20  practice that Defendants engaged in for the sole purpose of fraudulently increasing
21  the reimbursements received from government healthcare programs.

22         88.    Relator is aware that from at least January 2012 through the present,
23  Defendants have routinely and intentionally circumvented CMS's transfer DRG
24  policies by forcing patients who are ready to be discharged to remain at the
25  hospitals for longer than medically necessary, rather than having the patients
26  transferred to another appropriate health care facility.  As a result, Defendants
27  qualify for the higher reimbursement rate normally reserved for standard DRGs and
28  can avoid the lower reimbursement rates associated with Transfer DRGs.

27

89.     Two forms were circulated by Prime Corporation showing handwritten notes by non-treating Prime Staff, suggesting that certain patients had been discharged too soon and how increasing those patients' lengths of stay could avoid the fee splitting resulting from transfer DRGs.

90.     On November 15, 2012, Relator attended a meeting with various case managers, including Mohammed Ibrahim, a Clinical Documentation Information Specialist (CDI) at Alvarado Hospital.  Ibrahim informed Relator that, at least twice a week, Defendant Reddy provides Ibrahim with multiple case reviews of Medicare patients that Reddy believes were discharged too soon.  At no time has Defendant Reddy been the treating physician for these patients.

91.     Additionally, Defendant Reddy instructed Ibrahim and other CDIs to begin taking steps to avoid the Transfer DRG classification by finding ways to influence the treating physicians to increase individual patients' LOS, thereby maximizing the hospitals' reimbursement rate.

92.     For example, Patient AA was admitted to Alvarado Hospital on November 7, 2012 and was administered services that have a geometric mean LOS of 5.1 days.  The initial DRG was coded as 208, Respiratory System Diagnosis with Ventilator Support less than 96 hours.  Because of the patient's condition, the DRG was changed to 207, Respiratory System Diagnosis with Ventilator Support greater than 96 hours.  The patient had a progressive course of medical issues that was treated and the patient's DRG was finalized as 4 TRACH w/ MV 96+ hrs. OR PDX EX FACE, MOUTH, NECK W/O MAJ OR.  However, when Patient AA was going to be discharged, Defendant Reddy circulated the medical billing paperwork among Ibrahim and other CDIs with handwritten notes alerting the CDIs that they should not allow Patient AA to be discharged more than three days before the target geometric LOS.

93.     As a consequence of the pressure by Defendant Reddy to avoid the reimbursement fee-splitting associated with Transfer DRGs, physicians began

28

refusing to discharge patients. Patient AA was extubated on November 20, 2012

and appeared ready for transfer to a post-acute facility.  Relator is aware that on or

about November 20, 2012, Dr. Neelakatan Ramineni, a physician at Alvarado

Hospital, had written orders to transfer this patient to a post-acute care facility.

However, upon learning that the patient was going to be discharged several days

before the geometric LOS of 22.2 days, Dr. Ramineni canceled the transfer order

and held the patient in Alvarado Hospital's Advanced Care Unit (ICU step down

unit ) until the full geometric LOS days were reached, thereby allowing Alvarado

Hospital to receive the full reimbursement rate.  Notably, Defendant Reddy had

been advising Dr. Ramineni and his associate medical group members to attempt to

meet the full geometric LOS at Alvarado Hospital for the purpose of receiving

higher reimbursement from Medicare.

94.    Dr. Richard A. Mayer, another physician at Alvarado Hospital,

discovered that the tracheostomy patient had been ready for transfer and voiced his

concerns regarding the obvious patient safety issues of keeping the patient longer

than what was medically necessary.  In spite of these objections, Dr. Ramineni

refused to transfer the patient until the entire geometric LOS had been reached.

95.    Relator is aware of additional fraudulent practices at Prime in order to

increase patients' LOS.  Under certain limited conditions, Medicare will pay some

nursing home costs for Medicare beneficiaries who require skilled nursing or

rehabilitation services. To be covered, the patient must receive the services from a

Medicare certified skilled nursing home after a qualifying hospital stay. A

qualifying hospital stay is the amount of time spent in a hospital just prior to

entering a nursing home. This is at least three days.

96.    At the December 13, 2013 meeting detailed in Paragraph 48, *supra*,

Defendant Reddy instructed hospital administrators and physicians to have the

nursing homes give the hospital administrators an internal sheet listing patients

whose Medicare days have expired so when one of the patients gets sick, the

29

1  nursing home sends the patient to the hospital. This hospital stay can then generate

2  a three-day qualifying stay in the hospital, extending a patient's Medicare benefit

3  period or beginning a new Medicare benefit period in the nursing home.

4       97.    By promoting the transfer and admission between the nursing home

5  and the hospital, the process allows the nursing homes to avoid lower paying daily

6  Medi-Cal rates (~$300 per day) and receive the higher Medicare daily rates (~$600

7  per day). Defendant Reddy promoted the use of the internal list and tracking the

8  diagnoses explicitly to increase referrals to Alvarado Hospital and to allow the

9  nursing homes to obtain maximum reimbursement amounts from Medicare.

10       98.    Based on the fact that Reddy conducts similar meetings at all of the

11  PHS hospitals, Relator believes that the same instructions have been issued and the

12  same procedures regarding transfer DRGs and fraudulently increasing LOS have

13  been implemented throughout the Prime healthcare system. In addition, when

14  Reddy issues instructions or discusses hospital procedures, such as those involving

15  LOS, Relator has observed that he routinely addresses these matters on a system-

16  wide basis.  Furthermore, as previously described, based on Relator's observations

17  as an insider, PHS is centrally operated and routinely uses the same processes at all

18  its hospitals.

19       99.    Defendants' fraudulent activities described above (admitting patients

20  when medically unnecessary, upcoding to increase MS-DRG reimbursements, and

21  refusing to discharge patients) have caused the submission of false or fraudulent

22  claims for payment which have caused monetary damages to the government.  In

23  addition, the fraudulent conduct has resulted in Defendants knowingly concealing

24  or knowingly and improperly avoiding or decreasing an obligation to pay or

25  transmit money or property to the Government.  Defendants have received

26  overpayments from Medicare and have failed to report and return them within the

27  time periods specified in 42 U.S.C. § 1320a-7k(d)(2).

28

# VI.

## FIRST CLAIM FOR RELIEF:

**A.**   **Violations of the Federal False Claims Act, 31 U.S.C. § 3729(a)**

100.   Relator incorporates paragraphs 1 - 99 of this complaint as though fully set forth herein.

101.   As described above, Defendants have submitted and/or caused to be submitted false or fraudulent claims to Medicare and other government healthcare programs by billing for medically unnecessary inpatient short stay admissions which should have been classified as outpatient/observation cases; by wrongfully increasing their DRG payments from Medicare by falsifying information concerning patients' diagnoses, complications, and comorbidities; by improperly increasing patients' lengths of stay; and by failing to report and return overpayments from Medicare within the required time period.

102.   In doing so, Defendants have violated:

    (1)   31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, false or fraudulent claims for payment or approval; and/or

    (2)   31 U.S.C. § 3729(a)(1)(B) by knowingly making, using or causing to be made or used, a false record or statement material to a false or fraudulent claim; and/or

    (3)   31 U.S.C. § 3729(a)(1)(G) by knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.

103.   To the extent any of the conduct alleged herein occurred on or before May 20, 2009, Relator alleges that Defendants knowingly violated 31 U.S.C. §

1  3729(a)(1); 31 U.S.C. § 3729(a)(2); and 31 U.S.C. § 3729(a)(7) prior to

2  amendment, by engaging in the above-described conduct.

3      104.   Because of the false or fraudulent claims made by Defendants, the

4  United States has suffered, and continues to suffer damages.

5

6                              **PRAYER**

7  WHEREFORE, Relator requests that judgment be entered against Defendants

8  ordering that:

9      a.     Defendants pay an amount equal to three times the amount of damages

10  the United States has sustained because of Defendants' actions, plus a civil penalty

11  against Defendants of not less than $5,500 and not more than $11,000 for each

12  violation of 31 U.S.C. § 3729;

13     b.     Relator be awarded the maximum amount allowed pursuant to 31

14  U.S.C. § 3730(d);

15     c.     Defendants cease and desist from violating the False Claims Act, 31

16  U.S.C. § 3729, *et seq*.;

17     d.     Relator be awarded all costs of this action, including attorneys' fees,

18  expenses, and costs pursuant to 31 U.S.C. § 3730(d); and

19     e.     The United States and Relator be granted all such other relief as the

20  Court deems just and proper.

21

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

## DEMAND FOR JURY TRIAL

A jury trial is requested for all issues so triable.

DATED:  June 30, 2017                    Respectfully submitted,

                                         By  /s/ Stephen G. Larson
                                             Stephen G. Larson (SBN 145225)
                                             Melissa A. Meister (SBN 296744)
                                             Kelly R. Graf (SBN 301325)
                                             LARSON O'BRIEN LLP
                                             555 S. Flower Street, Suite 4400
                                             Los Angeles, CA  90071
                                             Tel:  213-436-4888
                                             Fax:  213-623-2000
                                             slarson@larsonobrienlaw.com
                                             mmeister@larsonobrienlaw.com
                                             kgraf@larsonobrienlaw.com

                                             Attorneys for Relator
                                             KARIN BERNTSEN

DATED:  June 30, 2017                    Respectfully submitted,
                                         JAMES HOYER,  P.A.

                                         By  /s/ Elaine Stromgren
                                             Elaine Stromgren (SBN 417610)
                                             Admitted Pro Hac Vice
                                             Sean P. Keefe (SBN 413828)
                                             Admitted Pro Hac Vice
                                             JAMES HOYER, P,A.
                                             2801 W. Busch Blvd. Suite 200
                                             Tampa, FL 33618
                                             Tel.: 813-375-3700
                                             Fax: 813-375-3710
                                             estromgren@jameshoyer.com
                                             skeefe@jameshoyer.com

                                             Attorneys for Relator
                                             KARIN BERNTSEN

///

///

33

1   DATED:  June 30, 2017                    Respectfully submitted,

2

3                                      By   /s/ Marlan B. Wilbanks

4                                           Marlan B. Wilbanks (SBN 758223)
                                            *Admitted Pro Hac Vice*
                                            Susan S. Gouinlock (SBN 303217)
5                                           *Admitted Pro Hac Vice*
                                            WILBANKS & GOUINLOCK, LLP
6                                           Monarch Plaza
                                            3414 Peachtree Rd., NE, Suite 725
7                                           Atlanta, Georgia 30326
                                            Tel.: 404-842-1075
8                                           Fax: 404-842-0559
                                            *mbw@wilbanksgouinlock.com*
9                                           *ssg@wilbanksgouinlock.com*

10                                          Attorneys for Relator
                                            KARIN BERNTSEN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34