CHAD A. READLER
Acting Assistant Attorney General
SANDRA R. BROWN
Acting United States Attorney
DOROTHY A. SCHOUTEN, AUSA
Chief, Civil Division
DAVID K. BARRETT, AUSA
Chief, Civil Fraud Section
LINDA A. KONTOS, AUSA
Deputy Chief, Civil Fraud Section
ABRAHAM C. MELTZER, AUSA
California State Bar No. 162659
        Room 7516, Federal Building
        300 North Los Angeles Street
        Los Angeles, California 90012
        Tel: (213) 894-7155; Fax: (213) 894-7819
        E-mail: Abraham.Meltzer@usdoj.gov
MICHAEL D. GRANSTON
DANIEL R. ANDERSON
MARIE V. BONKOWSKI
VANESSA I. REED
BENJAMIN C. WEI
ADAM R. TAROSKY
Attorneys, Civil Division
United States Department of Justice
        601 D Street NW, Room 9542
        Washington, DC 20004
        Tel: (202) 514-6833; Fax: (202) 305-7797
        E-mail: Marie.Bonkowski@usdoj.gov
        Tel: (202) 514-7372; Fax:  (202) 305-7797
        E-mail: Vanessa.Reed@usdoj.gov

Attorneys for the United States of America

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* KARIN BERNTSEN, <br><br> **Plaintiff**, <br><br> v. <br><br> PRIME HEALTHCARE SERVICES, INC.; PREM REDDY, M.D.; PRIME HEALTHCARE FOUNDATION, INC., F/K/A PHSI FOUNDATION, INC., F/K/A PRIME HEALTHCARE SERVICES FOUNDATION, INC; PRIME HEALTHCARE | No. CV 11-08214 PJW <br><br><br> **AMENDED COMPLAINT IN INTERVENTION AND DEMAND OF THE UNITED STATES FOR JURY TRIAL** |

1  MANAGEMENT, INC., F/K/A PRIME
   MANAGEMENT SERVICES, INC.;
2  ALVARADO HOSPITAL, LLC;
   PRIME HEALTHCARE SERVICES
3  GARDEN GROVE, LLC; PRIME
   HEALTHCARE HUNTINGTON
4  BEACH, LLC; PRIME
   HEALTHCARE LA PALMA, LLC;
5  DESERT VALLEY HOSPITAL, INC.;
   PRIME HEALTHCARE SERVICES
6  ENCINO, LLC; VERITAS HEALTH
   SERVICES, INC.; PRIME
7  HEALTHCARE SERVICES
   MONTCLAIR LLC; PRIME
8  HEALTHCARE PARADISE
   VALLEY, LLC; PRIME
9  HEALTHCARE SERVICES SAN
   DIMAS, LLC; PRIME HEALTHCARE
10 SERVICES SHASTA, LLC; PRIME
   HEALTHCARE ANAHEIM, LLC;
11 PRIME HEALTHCARE CENTINELA,
   LLC; PRIME HEALTHCARE
12 SERVICES SHERMAN OAKS, LLC

13          **Defendants**.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff United States of America, on behalf of the United States Department of Health & Human Services, alleges as follows:

## I.    <u>SUMMARY OF THE ACTION</u>

1.      This is an action for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729 – 3732, and damages under the common law.

2.      The Prime healthcare system is comprised of a variety of private corporate entities that are owned and controlled by defendant Prem Reddy, M.D. (Reddy) and/or trusts established for the benefit of Reddy and his family, including defendant Prime Healthcare Services, Inc. (PHS), defendant Prime Healthcare Foundation, Inc., f/k/a PHSI Foundation, Inc., f/k/a Prime Healthcare Services Foundation, Inc. (Foundation), defendant Prime Healthcare Management, Inc., f/k/a Prime Management Services, Inc. (Management Company), and individual hospitals throughout the United States.  PHS is a for-profit California corporation founded by Reddy in or around 2001.  The Foundation is a not-for-profit California corporation founded by Reddy in or around 2007.  Both entities are incorporated in Delaware and located at 3300 East Guasti Road, Ontario, California, 91761.  At all times relevant to this action, Reddy was the Chairman, President, and Chief Executive Officer of PHS and the Foundation.  The Management Company is a for-profit California corporation founded by Reddy in or around 2004.  Like PHS and the Foundation, it is incorporated in Delaware and located at 3300 East Guasti Road, Ontario, California, 91761.  At all times relevant to this action, Reddy was the President of the Management Company, which provides management, consulting, and support services to hospitals owned and operated by PHS and the Foundation.  PHS, the Foundation, and the Management Company are referred to, collectively, as Prime.  Reddy and Prime own and operate 14 general acute-care hospitals in communities throughout California, each of which is also a defendant in this action.  These 14 hospitals are referred to, collectively, as the Defendant Hospitals.  Reddy, Prime, and the Defendant Hospitals are referred to, collectively, as Defendants.

1

3.      Prime's business model is to buy distressed hospitals and make them profitable.  Prime tells the public that it accomplishes these turnarounds by "investing tens of millions of dollars on capital improvements . . . , maintaining emergency departments . . . that are open and accessible to all members of the community, including the uninsured and indigent, [and] implementing, with the support and assistance of the independent medical staff, proven clinical protocols which improve the quality of care received by all patients."

4.      But from 2006 through September 30, 2013, Defendants engaged in a systematic practice of maximizing revenues by, among other things, inducing physicians who work at Prime hospitals to increase the number of inpatient care admissions of Medicare beneficiaries who visit the Emergency Department (ED) at a Prime hospital, without regard to whether inpatient admission is medically necessary.

5.      Inpatient care generally refers to any medical service that requires admission into a hospital and tends to be directed towards more serious ailments and trauma that require one or more days of overnight stay at a hospital.

6.      In order to be payable by Medicare, an item or service must be "reasonable and necessary" in accordance with federal law and Medicare policy.  If a hospital inpatient admission is not reasonable and necessary, then the admission is not payable under Medicare Part A.  For example, if a beneficiary could appropriately be treated in the ED on an outpatient basis, then the inpatient admission is neither reasonable and necessary nor payable under Medicare Part A.

7.      Observation services are appropriate when a Medicare beneficiary presents to the ED with symptoms whose treatment or monitoring requires more time to assess than the typical ED visit.  Observation is used to help the physician decide whether the patient needs to be admitted or can be discharged.  Medicare reimburses for observation services as outpatient services, even if the patient stays in the hospital overnight.  As

with inpatient admission, observation services must be reasonable and necessary for treatment of the patient's medical condition in order to be reimbursed by Medicare.

8.     When a Prime hospital admits a beneficiary as an inpatient who should have received the same treatment at a lower level of care, Medicare pays Prime approximately three to four times the reimbursement amount the hospital would have received had it billed for the services rendered to the beneficiary at the appropriate level of care.

9.     When a Prime hospital admits a beneficiary as an inpatient when admission was not medically necessary, and provides medically unnecessary inpatient services, Medicare pays for care that was not reasonable and necessary and, therefore, not eligible for reimbursement.

10.     More than 50 million people are enrolled in Medicare.  There are 4,700 inpatient hospital facilities enrolled as Medicare providers.  In 2012, Medicare paid hospitals $119 billion for inpatient services and $46 billion for outpatient services. MedPAC Report to the Congress:  Medicare Payment Policy, March 2015, p. 53, Table 3-1.  The sheer magnitude of the Medicare program requires Medicare to trust hospitals and doctors to prioritize the needs and well-being of beneficiaries, rather than their own financial self-interest, in making treatment decisions, including decisions regarding inpatient admission versus hospital outpatient treatment.

11.     Prime's management, led by Reddy, developed and implemented practices and procedures that violate that trust and instead induce ED doctors to admit Medicare beneficiaries as inpatients whose signs, symptoms and treatment needs should have been appropriately managed as outpatients receiving observation services or even in the ED.

12.     These practices and procedures include:

> (a)     Removing "observation" as an option from the admission forms utilized by emergency room physicians and that had previously been used at hospitals prior to their acquisition by Prime;

(b)     Imposing quotas and goals for admission of patients from the ED and, specifically, of Medicare beneficiaries;

(c)     Deploying CEOs of hospitals, Chief Medical Officers and ED Medical Directors to question individual ED physicians regarding their decision to discharge specific patients and threaten that they would find themselves "off the schedule" if they did not increase their rate of admissions;

(d)     Telling ED physicians that any insured patient expected to be in the ED for more than two hours should be admitted as an inpatient, while an uninsured patient may be kept in the ED for many hours and then discharged;

(e)     Supplying unwitting Prime physicians with versions of admission criteria that are published by a third party and relied upon in hospitals nationwide that Prime had altered to make more permissive of inpatient admission but which Prime represented as the original criteria.

13.     Some Prime physicians and staff members protested these practices and procedures and then quit or had their positions terminated by Defendants.  Others acquiesced to protect their livelihoods.

14.     As a result of these practices and procedures, Defendants have claimed and received millions of dollars in inflated reimbursements for medically unnecessary inpatient admissions.  In so doing, Defendants have burdened the finite resources of the Medicare program and put their own pecuniary interests ahead of the interests of Medicare.

## II.     JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is the Plaintiff.  In addition, the Court has

4

subject matter jurisdiction over the FCA cause of action under 28 U.S.C. § 1331 and supplemental jurisdiction to entertain the common law and equitable causes of action under 28 U.S.C. §1367(a).

16.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in, transacts business in and has committed the alleged acts in the Central District of California.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides in and transacts business in the Central District of California, and many of the alleged acts occurred in this District.

### III.   PARTIES

18.     Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health & Human Services ("HHS") and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").  At all times relevant to this Complaint, CMS was an operating division of HHS that administered and supervised the Medicare program.

19.     The *qui tam* plaintiff ("Relator") is Karin Berntsen, a registered nurse who was employed at Defendant Alvarado Hospital when Prime acquired it in November 2010.  Relator remains employed there and has served as the Director of Quality and Risk Management, the Director of Case Management, and most recently as the Director of Performance Improvement.  Relator initiated this action by filing a complaint against Defendants, among others, under the *qui tam* provisions of the False Claims Act, 31 U.S.C. §3730(b)(1).

20.     At all times mentioned herein, PHS was and now is a Delaware for-profit corporation with its principal place of business in Ontario, California.  PHS was founded in 2001 by Reddy, a cardiologist by training who is primarily responsible for directing the activities of PHS, its subsidiaries and its affiliated entities. The Foundation is an

entity affiliated with Reddy and PHS.  PHS has transferred ownership to the Foundation
of certain hospitals that it owned.  The Foundation currently owns and operates four
acute care hospitals in California that are part of the Prime healthcare system.  Through
wholly-owned subsidiaries, Prime now owns or operates the 14 Defendant Hospitals in
the state of California.  The 14 Defendant Hospitals, their operating entities, principal
places of business, and acquisition dates are as follows:

     (a)    Desert Valley Hospital, operated by Desert Valley Hospital, Inc.,
located at 16850 Bear Valley Road, Victorville, California, and
acquired by PHS on or about January 1, 2001;

     (b)    Chino Valley Medical Center, operated by Veritas Health Services,
Inc., located at 5451 Walnut Avenue, Chino, California, and acquired
by PHS on or about November 1, 2004;

     (c)    Sherman Oaks Hospital, Prime HealthCare Services - Sherman Oaks,
LLC, located at 4929 Van Nuys Boulevard, Sherman Oaks,
California, owned and operated by the Foundation, and acquired by
PHS on or about February 1, 2006 and donated to the Foundation on
or about January 1, 2012;

     (d)    Paradise Valley Hospital, operated by Prime Healthcare Paradise
Valley, LLC, located at 2400 East 4th Street in National City,
California, and acquired by PHS on or about March 1, 2006;

     (e)    Montclair Hospital Medical Center, Prime HealthCare Services -
Montclair, LLC, located at 5000 San Bernardino Street, Montclair,
California, owned and operated by the Foundation and acquired by
PHS on or about July 1, 2006, and donated to the Foundation on or
about December 31, 2010;

     (f)    Huntington Beach Hospital, Prime Healthcare Huntington Beach,
LLC, located at 17772 Beach Boulevard, Huntington Beach,

California, owned and operated by the Foundation, and originally acquired by PHS on or about September 30, 2006 and donated to the Foundation on or about January 1, 2013;

(g)    West Anaheim Medical Center, operated by Prime Healthcare Anaheim, LLC, located at 3033 West Orange Avenue, Anaheim, California, and acquired by PHS on or about September 30, 2006;

(h)    La Palma Intercommunity Hospital, operated by Prime Healthcare La Palma, LLC, located at 7901 Walker Street, La Palma, California, and acquired by PHS on or about September 30, 2006, and donated to the Foundation on or about January 2015;

(i)    Centinela Hospital Medical Center, operated by Prime Healthcare Centinela, LLC, located at 555 East Hardy Street, Inglewood, CA, and acquired by PHS on or about October 31, 2007;

(j)    Garden Grove Medical Center, operated by Prime HealthCare Services-Garden Grove, LLC, located at 12601 Garden Grove Boulevard, Garden Grove, California, and acquired by PHS on or about June 1, 2008;

(k)    San Dimas Community Hospital, operated by Prime HealthCare Services - San Dimas, LLC, located at 1350 West Covina Boulevard, San Dimas, California, and acquired by PHS on or about June 1, 2008;

(l)    Encino Hospital Medical Center, Prime Healthcare Services Encino, LLC, located at 16237 Ventura Boulevard, Encino, California, owned and operated by the Foundation and originally acquired by PHS on or about June 1, 2008 and donated to the Foundation in 2009;

7

(m)   Shasta Regional Medical Center, operated by Prime Healthcare Services Shasta, LLC, located at 1100 Butte Street, Redding, California, and acquired by PHS on or about October 31, 2008; and

(n)   Alvarado Hospital Medical Center, operated by Alvarado Hospital, LLC, located at 6655 Alvarado Road, San Diego, California, and acquired by PHS on or about November 17, 2010.

21.   Reddy, Prime's founder, Chairman, President, and Chief Executive Officer, has his primary residence at 14868 Riverside Drive, Apple Valley, California 92307-4821, in San Bernardino County, and has his principal place of business at Prime's corporate headquarters located at 3300 East Guasti Road, Ontario, California, 91761.

## IV.   **THE LAW**

### The False Claims Act

22.   The False Claims Act, 31 U.S.C. §§ 3729-3733 (FCA), provides for the award of treble damages and civil penalties for, *inter alia,* knowingly causing the submission of false or fraudulent claims for payment to the United States Government.

23.   The FCA provides, in pertinent part:

(a) LIABILITY FOR CERTAIN ACTS.—

(1) IN GENERAL.—Subject to paragraph (2), any person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay to transmit money or property to the Government ,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of

8

damages which the Government sustains because of the act of that person.

\* \* \*

(b) DEFINITIONS.—For purposes of this section—

(1) the terms "knowingly" and "knowingly"—

(A) mean that a person, with respect to information—

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud . . . .

31 U.S.C. § 3729 (as amended May 20, 2009).

24.     Prior to amendments to the FCA pursuant to Public Law 1111-21, the Fraud Enforcement and Recovery Act (FERA), effective May 20, 2009, the FCA provided, in pertinent part:

(a) Any person who—

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus three times the amount of damages which the Government sustains because of the act of that person . . . .

\* \* \*

(b) KNOWING AND KNOWINGLY DEFINED.—For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

9

> (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729 (as amended October 27, 1986).

25.     Section 4(f) of FERA provides that the 2009 amendments to the FCA "shall take effect on the date of enactment of this Act and shall apply to conduct on or after the date of enactment, except that . . . subparagraph (B) of section 3729(a)(1) of title 31, United States Code, as added by subsection (a)(1), shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. 3729 *et seq*.) that are pending on or after that date . . . ."

26.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, *47103 (1999), the civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

## V.     THE MEDICARE PROGRAM

27.     Enacted in 1965, Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., establishes the Health Insurance for the Aged and Disabled Program, commonly known as the Medicare Program or, simply Medicare.

28.     The Medicare Program is comprised of four parts:  Part A which provides Hospital Insurance Benefits, Part B which provides Medical Insurance Benefits, Part C which establishes Medicare Advantage (or managed care) plans, and Part D which provides for Prescription Drug Benefits.  Relevant to this complaint are Parts A and B. Medicare Part A is a 100 percent federally-funded health insurance program for qualified individuals aged 65 and older, younger people with qualifying disabilities, and people with End Stage Renal Disease (permanent kidney failure requiring dialysis or transplant).  *See* 42 U.S.C. §§ 426, 426A.  The majority of Medicare Part A's costs are paid by United States citizens through their payroll taxes.  The benefits covered by Medicare Part A include inpatient hospital care and other institutional care, including

10

skilled nursing facility and home health care services.  *See* 42 U.S.C. §§ 1395c –1395i-5. Medicare Part B establishes a voluntary supplemental insurance program that pays for various medical and other health services and supplies, including physician services, physical, occupational, and speech therapy services and hospital outpatient services.  *See* 42 U.S.C. §§ 1395k, 1395m, 1395x.

29.    Most hospitals, including all of the Defendant Hospitals, derive a substantial portion of their revenue from the Medicare Program.

30.    Medicare is administered by the Centers for Medicare & Medicaid Services (CMS).  At all times relevant to this complaint, CMS contracted with private contractors referred to as "fiscal intermediaries," "carriers," and "Medicare Administrative Contractors," to act as agents in reviewing and paying claims submitted by healthcare providers.  Payments are made with federal funds.  *See* 42 U.S.C. § 1395h; 42 C.F.R. §§ 421.3, 421.100.

31.    To participate in the Medicare program, health care providers enter into provider agreements with the Secretary of HHS.  42 U.S.C. § 1395cc.  The provider agreement requires the provider to agree to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations. As part of that agreement, the provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me].  The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the [provider's] compliance with all applicable conditions of participation in Medicare.

Form CMS-855A; Form CMS-8551.

32.    Among the legal obligations of participating providers is the requirement not to make false statements or misrepresentations of material facts concerning payment

11

1   requests.  *See* 42 U.S.C. § 1320a-7b(a)(1)-(2); 42 C.F.R. §§ 1320a-7b(a)(1)-(2),

2   413.24(f)(4)(iv).

3         33.    Medicare reimburses only services that are "reasonable and necessary for

4   the diagnosis or treatment of illness or injury . . . ."  42 U.S.C. § 1395y(a)(1)(A). In

5   submitting claims for payment to Medicare, providers must certify that the information

6   on the claim form presents an accurate description of the services rendered and that the

7   services were reasonably and medically necessary for the patient.

8         34.    Federal law provides that it is the obligation of the provider of health care

9   services to ensure that services provided to Medicare beneficiaries are "provided

10   economically and only when, and to the extent, medically necessary[,]" and are

11   "[s]upported by evidence of medical necessity."  42 U.S.C. § 1320c-5(a)(1), (3).

12         35.    Acute care hospital inpatient services are reimbursed under the Inpatient

13   Prospective Payment System ("IPPS") by Medicare Part A.  This is a system developed

14   for Medicare to classify inpatient hospital cases into one of 538 Diagnostic Related

15   Groups ("DRGs"), which were expected to have similar hospital resource use.  DRGs

16   have been used since 1983 to determine how much Medicare pays the hospital, since

17   patients within each category are similar clinically and are expected to consume a similar

18   level of hospital resources.  A payment rate is established for each DRG.  In 2007,

19   Medicare adopted a refinement of the DRG system, called the Medicare Severity DRGs

20   (MS-DRGs), which expanded the number of DRGs to 745 and made other refinements.

21   Hereafter, DRGs and MS-DRGs will be collectively referred to as DRGs for clarity.

22         36.    Hospital outpatient services, including care rendered in a hospital ED, or

23   when a beneficiary receives "observation" services, are reimbursed under the hospital

24   Outpatient Prospective Payment System (OPPS) by Medicare Part B.  All outpatient

25   services are classified into groups called Ambulatory Payment Classifications (APCs).

26   Services in each APC are similar clinically and in terms of the resources that they

27

28

require.  A payment rate is established for each APC.  Depending on the services provided, hospitals may be paid for more than one APC per patient encounter.

37.     Medicare classifies observation services as a type of hospital outpatient care.  Observation services help the physician determine the cause of a patient's symptoms in order to decide if the patient needs to be admitted as an inpatient or can be discharged.  Typically observation services are ordered for patients who present to the ED and who require a significant period of treatment or monitoring in order to inform a decision by physicians concerning their admission or discharge.  Observation services include short term treatment, assessment, and reassessment provided while a decision is being made about discharge or admission.  A patient may receive observation services in an ED, a dedicated observation unit, or in any bed in the hospital.  A patient receiving observation services receives all nursing, medical care, diagnostic tests (*e.g.*, laboratory tests, x-rays and other radiological tests), therapy, and prescriptions ordered by her physician, as well as a bed and food for the duration of her stay.  Medicare expects that a decision whether to discharge a patient receiving observation services or admit her as an inpatient will occur in less than 48 hours, and usually in less than 24 hours.  *See* CMS Publication 100-02, Medicare Benefit Policy Manual, Ch. 6, § 20.6 (Rev. 189).

38.     At all times pertinent to this complaint, observation services were billed as a time-based service, with the minimum period of observation that was reimbursable being eight hours.  From January 1, 2006 through December 31, 2007, Medicare reimbursed hospitals a separate APC payment for outpatient observation services involving three specific conditions:  chest pain, asthma, and congestive heart failure.  Payments for observation services provided to beneficiaries with other conditions were packaged into the payments for those patients' ED visits.  *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4, §§ 290.1, 290.4.3. (Rev. 787).

39.     On January 1, 2008, Medicare removed the limitation of diagnoses eligible for an additional payment for observation.  Since 2008, hospitals may bill a composite

APC for extended assessment and management of any patient who receives observation services for eight or more hours who had an ED visit the day that observation services began or the previous day.  *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4 § 290.5.1 (Rev. 787).

40.     Medicare reimburses hospitals for surgical procedures on either an inpatient or an outpatient basis, depending on whether the patient has been formally admitted as an inpatient (and subject to medical necessity review).  Medicare designates certain procedures as payable only when performed on an inpatient basis.  Medicare's rationale for designating certain procedures as "inpatient only" is that either the nature of the procedure, the typical underlying physical condition of patients who require the procedure, or the need for at least 24 hours of postoperative recovery time or monitoring before the patient can be safely discharged dictates that Medicare payment is appropriate only if the service is furnished on an inpatient basis.  *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4 §180.7 (Rev. 787).  These procedures are called "inpatient only" procedures.  CMS publishes a list of "inpatient only" procedures annually.  All other Medicare-covered procedures may be provided - and paid by Medicare - on either an inpatient or an outpatient basis, depending upon the individual patient's clinical condition and reaction to the surgery, including any complications that occur.  An individualized assessment of the patient's condition must be made instead of routinely admitting all patients who have a certain procedure not listed on the inpatient only list.

41.     Medicare guidance directs hospitals to not bill for routine observation following all outpatient surgery, as a period of postoperative monitoring during a standard recovery period (e.g., 4-6 hours) is included in Medicare reimbursement for outpatient surgery. *See* CMS Publication 100-04, Medicare Claims Processing Manual, Ch. 4 §290.2.2 (Rev. 787).

42.     The Medicare Program Integrity Manual instructs FIs and MACs that in order for a claim for inpatient care to be payable:

> Review of the medical record must indicate that inpatient hospital care was medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay.  The beneficiary must demonstrate signs and/or symptoms severe enough to warrant the need for medical care and must receive services of such intensity that they can be furnished safely and effectively only on an inpatient basis.

CMS Publication 100-08, Medicare Program Integrity Manual, Ch. 6 § 6.5.2 (Rev. 656).

43.     Medicare defines an inpatient as a person who has been formally admitted to a hospital by a physician for the purpose of receiving inpatient services.  CMS Publication 100-02, Medicare Benefit Policy Manual, Ch. 1, § 10 (Rev. 189).

44.     The physician decides whether to admit the patient as an inpatient and, if so, when to do so.  The Medicare guidance in effect during the time period at issue in this complaint advised physicians to "use a 24-hour period as a benchmark, i.e., they should order admission for patients who are expected to need hospital care for 24 hours or more, and treat other patients on an outpatient basis." *Id.*

45.     CMS recognizes that the decision whether to admit a patient is made by the physician who should consider a number of relevant factors, including the patient's medical history, current medical needs,

> "The severity of the signs and symptoms exhibited by the patient;
> "The medical predictability of something adverse happening to the patient;
> "The need for diagnostic studies that appropriately are outpatient services (i.e., their performance does not ordinarily require the patient to remain at the hospital for 24 hour or more) to assist in assessing whether the patient should be admitted; and
> "The availability of diagnostic procedures at the time when and the location where the patient presents."

*Id.*

46.     Additionally, the Manual provides guidance regarding the proper classification of patients having minor surgeries or other treatments, as follows:

> **"Minor Surgery or Other Treatment** – When patients with known diagnoses enter a hospital for a specific minor surgical procedure or other treatment that is expected to keep them in the hospital for only a few hours (less than 24), they are

15

considered **outpatients** for coverage purposes regardless of the hour they came to the hospital, whether they used a bed, and whether they remained in the hospital past midnight."

*Id.*

47.     Following the discharge of a Medicare beneficiary from a hospital, the hospital submits a patient-specific claim for interim reimbursement for items and services furnished to the beneficiary during his or her hospital stay.  42 C.F.R. §§413.1, 413.60, 413.64.  Hospitals submit claims on Form CMS-1450, also called Form UB-04.  Claims for inpatient services are submitted to Medicare Part A.  Claims for observation and other outpatient services, including ED visits and outpatient surgery, are submitted to Medicare Part B.

## VI.    FACTUAL ALLEGATIONS

### A.     Defendants Adopted Policies and Practices Designed to Increase Inpatient Admissions Without Regard to Medical Necessity.

48.     Reddy, Prime and the Defendant Hospitals acted with actual knowledge, deliberate ignorance or reckless disregard of the laws, regulations and guidance applicable to the federal healthcare programs by developing and implementing a business model premised on policies and practices designed to increase inpatient admissions of Medicare beneficiaries to Defendant Hospitals without regard to medical need.  These policies and practices were adopted for Defendants' financial gain rather than clinical reasons and included: 1) discouraging the use of, or even eliminating, observation services; 2) setting aggressive quotas to pressure ED physicians to admit more patients; 3) criticizing and penalizing ED physicians who did not fall in line with the Prime business model; and 4) misrepresenting Prime's admission criteria forms as industry-accepted Milliman Care Guidelines.  Prime's policies and procedures led to the submission of false or fraudulent claims for inpatient medical services.

49.     Prime's strategy was evident in Reddy's insistence that Prime physicians and staff consider the insurance status of a patient when deciding whether or not to admit, which prioritized the financial goals of Prime over the clinical needs of the

16

patient.  In November 2008, for example, during a meeting with ED physicians, Reddy directed physicians to consider a patient's insurance information before providing services.   On other occasions, Reddy instructed ED physicians to consider whether a patient was a Medicare or Medi-Cal beneficiary before deciding which services the hospital would provide.

### 1. Defendants Implemented a "No Observation" Policy.

*a.   Prime Sought to Prevent the Use of Observation Services Because the Reimbursement Is Less Than It Would Be For Providing the Same Services to an Inpatient.*

50.   Prime, acting through Reddy and others, acted purposefully to eliminate the use of observation at Defendant Hospitals.

51.   For example, upon acquiring a hospital, Prime, acting through Reddy and others, would inform physicians and staff that the hospital would no longer use observation for Medicare beneficiaries or other insured patients.  The purpose of this policy was to increase admissions by turning ED patients into inpatients when they should have been treated right there and released or provided observation services. Prime repeatedly told hospital executives, physicians, nursing supervisors, case managers, clinical documentation specialists and other staff that the Defendant Hospitals did not provide observation services, and that patients for whom such services should have been appropriate were to be made inpatients.

52.   Upon acquisition, Prime also replaced existing order forms used by both ED and attending physicians with standard order forms used in all Prime hospitals.  Prime's order forms did not provide a check box option for observation services and had the effect of discouraging physicians from ordering observation for patients in circumstances where they otherwise would have.  On one occasion, when Reddy discovered that order forms were still in use that included a check box for observation, he directed that the option for observation be immediately removed.

53.     As is generally the case at hospitals in the United States, Prime ED physicians did not have admitting privileges or had limited privileges.  ED physicians at the Defendant Hospitals usually had to contact an attending physician or hospitalist - a doctor specializing in the care of hospitalized patients - who would admit the patient. Within a short period of time after Prime acquired a hospital, most admissions from the ED were made by hospitalists working under contract to Defendants.  Defendants pressured the hospitalists to accept all admission recommendations from ED physicians, instead of requiring that a patient be placed in observation to determine whether an inpatient admission was necessary.

54.     The "no observation" policy was communicated to ED physicians and hospitalists in meetings with Reddy and other Prime executives and employees, via multiple separate conversations with Reddy and other Prime executives, and through transmission of this information from ED and hospitalist Medical Directors to individual ED physicians and hospitalists.

55.     At Garden Grove Hospital, for example, Reddy instructed physicians not to use observation because, according to Reddy, the hospital was not licensed for observation beds.  Reddy told them this despite knowing, as did others at Prime, that observation services can be provided in any duly licensed hospital bed: a dedicated observation bed is not required by Medicare.

56.     And when Prime acquired Alvarado Hospital, Relator Berntsen was the Director of Case Management.  Case managers are nurses who, among other things, review patient medical records to assist physicians and hospitals with determining whether inpatient admission or outpatient/observation services are appropriate.  Relator raised concerns to management at Alvarado Hospital about the marked decrease in use of observation services at Alvarado that followed Prime's acquisition of the hospital.  She was told by Prime executives that she and her case managers should no longer review Medicare admissions to assess whether the patients met inpatient criteria.

18

57.     Another example of the implementation of Prime's "no observation" policy is a July 6, 2012, meeting of case managers from multiple Prime hospitals.  There, Ajith Kumar, Prime's Vice President of Reimbursement, claimed that Prime hospitals can provide observation services but do not provide them to Medicare beneficiaries because all, or almost all, Medicare beneficiaries satisfy the criteria for inpatient admission.

> b.     *Prime Directed ER Physicians to Admit Insured Patients If They Would Be In the ER More Than Two Hours.*

58.     The "no observation" policy went hand-in-hand with a policy of directing ED physicians to admit insured patients from the ED if their evaluation or treatment would take longer than two hours.

59.     The two-hour rule or guideline applied only to insured patients.  ED physicians were told to keep uninsured patients in the ED far longer in an effort to avoid the cost to the hospital of an uninsured inpatient admission.

60.     In telling ED physicians that Prime does not provide observation services and instructing them that insured patients should be admitted as inpatients after only two hours, Prime encroached upon the physicians' medical judgment and discretion about how to treat patients and caused medically unnecessary admissions.

> c.     *The "No Observation" Policy Worked: Billings to Medicare Plummeted After Prime Acquired a Hospital.*

61.     Medicare claims statistics show a dramatic before-and-after shift in billings for observation services at hospitals Prime acquired.

62.     As noted above, observation services were billed as a time-based service.  Over and over, after Prime acquired a hospital, that hospital's billings to Medicare for observation service hours dropped, quarter to quarter, by hundreds or even thousands of hours.  At many hospitals, including but not limited to, La Palma Intercommunity Hospital, Garden Grove Medical Center, Paradise Valley Hospital, West Anaheim

Medical Center, and Huntington Beach Hospital, billings for observation service hours plummeted to almost zero.

63.     The decreases in billings for observation hours were matched by increases in claims for inpatient admissions relative to the hospitals' historical statistics.

## 2.     Defendants Set Aggressive Quotas for Inpatient Admissions of Insured Patients, Including Medicare Beneficiaries.

64.     Beginning in or before 2007, Reddy and Prime introduced arbitrary admission benchmarks or quotas that Defendant Hospitals should admit as inpatients 20 to 30% of the insured patients who presented to the ED.  The setting of such a target violates a fundamental principle of the Medicare program: namely, that treatment decisions, including the decision to admit inpatients, should be based upon beneficiaries' clinical needs and that only services that are reasonable and medically necessary to meet those needs are reimbursable by Medicare.

65.     Reddy, Prime and the Defendant Hospitals knew that setting an arbitrary quota for the percentage of ED patients that should be admitted as inpatients would result in medically unnecessary admissions of Medicare beneficiaries.   And Prime's quota had a discernable effect on the admission practices at Defendant Hospitals. Inpatient admissions of Medicare beneficiaries increased dramatically after Prime acquired a hospital and instituted a 20 to 30% admission quota.  Prime's admission quotas caused the Defendant Hospitals to seek Medicare Part A reimbursements for inpatient admissions where the necessary services should have been provided as observation services.

66.     In addition to causing the Medicare program to pay millions of dollars for unnecessary inpatient stays, these unnecessary admissions needlessly exposed Medicare beneficiaries to the dangers inherent in any hospital stay, including but not limited to medical errors and hospital-acquired infections.

*a.*   *Reddy Personally Communicated the Quotas to ED Physicians, and They Got the Message.*

67.   Shortly after Prime acquired a new hospital, Reddy routinely scheduled mandatory meetings in order to "educate" ED physicians about Prime's new ED policies and procedures.

68.   During these initial meetings, Reddy delivered the same edict to all physicians: increase inpatient admissions of insured patients to 20 to 30% of the ED census and cut back on admissions of the uninsured to under 5% of the ED census.

69.   At these meetings, Reddy routinely and specifically discussed with ED physicians the higher Medicare reimbursements associated with an inpatient admission in comparison to treatment in the ED or observation services for the same condition. Physicians who attended these meetings with Reddy believed that his intention was to pressure ED physicians to alter their clinical judgment in favor of admitting Medicare beneficiaries to the hospital to increase Medicare reimbursements to Prime.

70.   Reddy's message to admit Medicare beneficiaries was received, loud and clear, by Prime physicians.  For example, an ED Director at Encino Hospital jokingly commented to other ED Directors in an email that he was "getting a little worried that the average age of my docs at Encino is just about Medicare range.  If I'm truly following the Prime model, I should be admitting all simply for setting foot in the ED."

71.   Reddy knew it was improper to apply pressure to admit.  In or around late 2008, after Prime acquired Defendant Shasta Regional Medical Center, Reddy met with ED physicians there and told them that Shasta's historical rate of admitting 17-18% of ED patients was not good enough.  Reddy instructed the ED physicians to increase their admission rate.  When the rates did not increase enough, Reddy met with the hospital's ED Director and told him that the rate needed to increase to 25 to 30%.  The ED Director proposed to draft an email to the ED physicians to memorialize the 25 to 30% quota for inpatient admission.  Reddy immediately admonished the ED Director in the presence of

21

1  another physician, warning that if the ED Director put that in writing Prime could be
2  sued.

3      72.    Despite such attempts by Reddy to prevent anyone from reducing Prime's
4  arbitrary ED admission quotas to writing, the quotas were communicated to ED
5  physicians through email communications, during ED meetings and in regular ED
6  reports distributed to management at all Defendant Hospitals.

       *b.*    *Prime Used Admission Statistics to Monitor and Enforce*
7                *Compliance with the Quotas.*
8

9      73.    Reddy, Prime and ED Directors routinely reviewed ED admission statistics
10  to assess compliance with Prime's admission quotas.  Admissions of Medicare
11  beneficiaries was one of the statistics that Prime tracked and reviewed.

12      74.    In or before 2007, Prime's Vice President of Nursing and Clinical
13  Operations was responsible for creating weekly, monthly and yearly ED statistical
14  reports, referred to as "report cards" or "Prime Healthcare Services Emergency
15  Dashboards."

16      75.    The hospital report cards contained data on the number of patients admitted
17  from the ED for that week/month, the number of admissions to the Intensive Care Unit,
18  the number of uninsured admissions, and the total percentage of ED patients who were
19  admitted as inpatients for each Prime hospital.

20      76.    Reddy personally reviewed the hospital report cards before their circulation
21  to Prime management and hospital ED Directors.

22      77.    Reddy and Prime management used the hospital report cards as a tool to
23  monitor whether the Defendant Hospitals were meeting Prime's admission quotas.  If a
24  hospital's admission percentages fell below the target, Reddy would alert hospital
25  management and arrange a meeting with the ED Director and/or the ED physicians who
26  were perceived as not complying with Prime's admission policies.

27
28

78.     The hospital report cards categorized hospitals that were meeting Prime's admission quota of 20-30% by highlighting the hospital in yellow as "best practices." For any hospital that fell below Prime's admission quota, the report card highlighted it in red and categorized it as "needs improvement."

79.     For example, Defendants Montclair Hospital Medical Center and Desert Valley Hospital admitted roughly 17% of their ED census in February 2007 and were highlighted in red and categorized as "needs improvement."

80.     Hospitals with high admission percentages were praised.  For example, according to the February 2007 hospital report card, Defendant Sherman Oaks Hospital admitted 27.9% of its ED census and was highlighted in yellow and categorized as having "best practices."  ED physicians saw that Reddy and Prime were not satisfied unless a hospital's admission rate reached 25-30% of its ED Census.  For example, Defendants Huntington Beach Hospital, La Palma Intercommunity Hospital and West Anaheim Medical Center admitted approximately 21-23.8% of their ED census in February 2007.  Prime did not recognize their admission percentage as falling within the "best practices" category.

c.     *ED Directors and Physicians Felt Pressure to Increase Admissions to Meet Defendants' Quotas.*

81.     Internal communications reveal that ED directors and physicians responded to Defendants' efforts to pressure them to admit more insured patients and fewer uninsured ones.  In October 2008, for example, an ED director emailed physicians at Defendant Encino Hospital to thank them for their hard work in increasing admissions through the ED.   "We are maintaining an appropriately high admissions percentage *in line with the expectations of Prime Healthcare*." (Emphasis added).

82.     Similarly, in an email to an ED physician at Defendant Encino Hospital in July 2009, the ED Director urged the physician to help increase admissions.  The ED Director stated that, "month to date we are at our lowest admission percentage for the

last 3 years. We are currently admitting only 15% of our patients. While my review of the daily ED logs indicate that we're clearly doing the right things for our patients, please understand that this is going to stand out to our administration.  *Please keep in mind the Prime mindset.  Push admissions as necessary and have a low threshold for admission for any insured patient (even Medi-Cal)*." (Emphasis added).

83.     In response to the above quoted email from Defendant Encino Hospital's ED Director, an ED physician pointed out that the ED's admission percentage would be higher, but "there's all those uninsured ones who would otherwise be admitted given their diagnosis but are held due to insurance status."

84.     Another example of ED directors and physicians responding to the pressure to admit is seen in a November 11, 2009, email that the ED Director sent to physicians upon learning that admitting percentages dropped below Prime's expectations at Defendant San Dimas Community Hospital.  The ED Director reminded the physicians of Prime's admission goals: "[W]e need to show that we are moving in the right direction to stay out of the firing line. Our admission percentage is down the past few weeks…. *I know this is a pain in the ass, but it's the way it is and if we actually CAN get close to their goal we'll make more $$.*"  (Emphasis added).

85.     Similarly, in an August 13, 2010 email, an ED Director noted "[o]ur admission percentage is slipping and we run the risk of increased scrutiny by Dr. Reddy."  And ED physicians at Defendant San Dimas Community Hospital received an email in September 2010 alerting them that "[o]ur % admissions is down and our number of transfers is up and Dr. Reddy [is] aware of it and [is] starting to make noises to admin and then to me."

86.     In May 2010, when Defendant Chino Valley Medical Center's monthly report card indicated a drop in admissions compared to the previous years' statistics, the ED Director advised ED physicians that Reddy was not pleased and issued an edict via

e-mail to "raise admissions by a couple of percentage points," to which another ED Director responded that "they will begin the process tomorrow."

                d.     *Prime Even Monitored and Reported Admission Rates of Individual ED Physicians.*

87.     To ensure that each individual ED physician was doing his or her part to increase admissions, Prime and the Defendant Hospitals tracked ED physician performance and productivity through various reports that focused on admission percentages and average length of stay and ranked the physicians using such non-clinical criteria.

88.     These reports were routinely circulated not only to ED physicians but also to executives and staff at Prime hospitals.

89.     In 2008, for example, Defendant Chino Valley Medical Center presented a Physician Analysis Report that tracked ED physician admissions and a Top Ten Physician Report to the hospital's Medical Executive Committee.

90.     And in 2010, for example, Defendant Chino Valley Medical Center circulated a report called ED Physician Matrix to ED physicians, requesting that they review their statistics, especially those physicians who fell below the admitting average of 17%.

          **3.**     **Reddy Personally Reviewed ED Logs for "Missed Admissions" and Confronted ED Physicians With Them.**

91.     Reddy, along with other Prime executives and ED directors, reviewed ED patient census logs to determine if physicians had passed up opportunities to admit Medicare beneficiaries to the hospital as inpatients. The ED logs included, among other things, each ED patient's name, gender, age, mode of transportation to the ED, insurance status, and the name of ED physician who saw the patient.

92.     Reddy taught Prime management -- including some individuals who had no medical training -- and ED Directors how to scour the ED logs for "missed admissions."

But Reddy himself personally reviewed ED logs from the Defendant Hospitals on a regular basis.

93.     Reddy would circle as "missed admissions" the insured patients that he felt could have been admitted to the hospital.  He then circulated his marked-up logs to each hospital ED Director.  The ED Director was tasked with tracking down the physician to discuss each discharge Reddy questioned and get the physician's justification for not admitting an insured patient.  Many times, Reddy personally spoke with an ED physician who discharged a Medicare beneficiary to "educate" him about the reasons why the patient should have been admitted.

> a.  *ED Directors and Physicians Were Troubled By Reddy's ED Log Reviews and Their Ramifications.*

94.     Many ED physicians were troubled by Reddy's practice of reviewing ED logs and the feedback they received from Reddy as a result of it.  Reddy's feedback often involved second-guessing the medical judgment of the ED physicians as to whether to admit or discharge an insured patient.  Several ED Physicians concluded that the ED log reviews were intended to interfere with and alter their clinical judgment in favor of admitting more Medicare beneficiaries and other insured patients to increase reimbursements to Defendants.  Some questioned Reddy's qualifications to conduct such reviews, given that he had trained to be a cardiologist, not an ED physician.  Physicians reported feeling pressured and browbeaten by Reddy and ED Directors over the "missed admissions."

95.     The quest to identify "missed admissions" turned, at times, into sport.  An email from a former Prime executive to an ED Director proposed a wager of two bottles of wine against two tickets to a professional basketball game if the ED Director identified 30 additional patients discharged during the month of May 2008 that could have been admitted.

96.     But pressure to avoid "missed admissions" was also applied in other, less sporting ways.  In January 2009, for example, an ED log review for Defendant Montclair Hospital Medical Center flagged certain patients that Prime management concluded could have been admitted.  The ED physician defended his decisions, stating that "none of the patients had a medical condition requiring admission."  The ED Director continued to press the issue, but the physician insisted that "these patients did not have final diagnosis that required admission."

97.     A month later, on February 1, 2009, the same physician was questioned again about his decision not to admit a patient, this time a 72-year-old Medicare beneficiary who presented with chest pain.  In an email exchange with the ED Director, the physician concluded that "they would have to agree to disagree."  The ED Director then emailed another physician stating that the physician who stood his ground is not "interested or [doesn't] care[] [about] the goals we are trying to achieve."

98.     At Defendant Shasta Regional Medical Center, Prime even resorted to posting the ED patient log containing Reddy's highlights of missed Medicare admissions in plain view on the door of the physician lounge.

99.     Some ED Directors expressed frustration with the constant pressure to admit patients with minor ailments and with Reddy's constant oversight and scrutiny of the medical judgment of the physicians.  An ED Director claimed that he would start circling his own census report so Reddy "won't find the need to circle every cold and kidney stone."  Another ED Director complained that Reddy "now wants to admit Otitis Externa and Cystitis."   Otitis Externa is the medical term for an ear infection.  Cystitis is the medical term for simple urine infection.  Yet another expressed concern in 2008, after reviewing an ED log that included Reddy's circles on patients with "colds, back pains and simple UTI's and simple gastroenteritis," that Reddy wanted to meet with the physicians to "scare the crap into the group."

27

100.   Physicians saw firsthand the consequences to patients of the pressure to admit that Prime applied to ED Directors and physicians.  In April 2009, for example, when management questioned a physician's decisions to discharge two elderly patients, the physician explained in an email that "we really cannot admit patients for minor medical problems related to delays in lab and x-ray."  The physician reported that patients had complained of being admitted for no reason and that others had stated that "when they were admitted, nothing was done for them."

> b.   *Physicians Who Caused "Missed Admissions" Were Criticized and In Jeopardy Of Losing Their Jobs.*

101.   Reddy and Prime targeted low admitters and threatened to have them taken off the ED work schedule.  In January 2009, for example, Reddy emailed an ED Director and remarked that a certain physician "does not fit in this model as he continues to have problems with admitting patients to the hospital for work up rather than working them up completely in the ER."

102.   Similarly, on December 19, 2008, the Chief Medical Officer at Chino Valley Medical Center emailed an ED Director to complain about a physician:   "[H]e sent away a Medicare admission … Get rid of this guy he does not fit in here."

103.   And at Defendant Shasta Regional Medical Center, Prime management singled out certain doctors as candidates for termination because they sent too many Medicare and Medi-Cal patients home when, in Prime's view, they could have admitted them to the hospital.

### 4.   Prime "Doctored" Widely Used Admission Criteria to Make Inpatient Admission More Likely.

104.   Milliman Care Guidelines, LLC, (MCG) is a Seattle-based company that independently develops, produces and sells evidence-based clinical guidelines and software that are updated annually (Milliman Guidelines).  MCG promotes the Milliman Guidelines as a tool for "avoiding underuse or overuse of medical resources" and as a

shared point of reference for providers and health plans when discussing medical necessity and coverage.

105.   The Milliman Guidelines encompass several different sets of guidelines that address different stages along the continuum of care, including, among others, Ambulatory Care (which pertains to outpatient care), Inpatient & Surgical Care and Multiple Condition Management.

106.   Health care providers across the county, including hospitals, use the Milliman Guidelines to inform and document clinical decision-making about, among other things, medical necessity and level of care.  Public and private health insurers use them, too.  For example, CMS specifies that the Milliman Guidelines or other screening tools should be used by Quality Improvement Organizations (QIOs) and Medicare Administrative Contractors (MACs).  These organizations are government contractors that perform Medicare healthcare quality and utilization reviews.  QIOs work to improve the quality of beneficiary care, and QIOs and MACs oversee inpatient hospital payment reviews.

> a.  *Prime Chose the Milliman Guidelines Because It Perceived Them As More Lenient Than the Alternative.*

107.   On January 24, 2009, Prime's Director of Reimbursement Management, Ajith Kumar, told other members of Prime management in an email that Prime would soon begin to contract with MCG in order "to use Milliman Care [] Guidelines as a standard reference for inpatient admission criteria and other standards of care."  He further stated that the Milliman Guidelines "will be the guidelines that we use to defend our admissions to [government auditors] or any other entity."

108.   Kumar acknowledged in that email that Prime was choosing to subscribe to the Milliman Guidelines over those published by a competitor known as Interqual.  Kumar stated that, because Interqual's guidelines are produced "for insurance

companies, the criteria of inpatient admission are too stringent and inpatient admissions are easily denied."

109.   Kumar further stated that "[w]e will not be able to defend more than half of our admissions if we use Interqual."

110.   Reddy evidently shared Kumar's view that the Milliman Guidelines would help Prime increase inpatient admissions.  The founder and chief executive officer of Emergent Medical Associates described in a February 9, 2009, email a lecture by Reddy that he had attended the night before.  During the lecture, Reddy, in the attendee's words, "referenced upon many occasions Mill[i]m[a]n as being more liberal and better for Prime."  Emergent Medical Associates provides ED doctors that staff the EDs at several Prime hospitals in southern California.

>b.   *Prime Altered the Milliman Guidelines to Make Inpatient Admission More Likely.*

Even the less "stringent," "more liberal" Milliman Guidelines were not lenient enough to satisfy Prime.  Prime systematically altered the Milliman Guidelines before making them available for use in hospitals Prime operates in California.  The alterations took different forms.  But the alterations consistently made inpatient admission more likely.

111.   In some instances, Prime omitted information from the Milliman Guidelines, including but not limited to criteria pertaining to less costly alternatives to inpatient admission.  For example, the Milliman Guidelines for Abdominal Pain and Chest Pain each includes a set of "Alternatives to Admission."  Prime's medical record for an inpatient admission of a Medicare beneficiary in June 2008 to Defendant Chino Valley Medical Center included a set of guidelines pertaining to abdominal pain that largely tracked the corresponding Milliman Guideline, M05, but entirely omitted the "Alternatives to Admission."   Those "Alternatives to Admission," had Prime not deleted them, would have included treatment and evaluation protocols that could be carried out

as "[o]utpatient care in emergency department, rapid treatment site, urgent care center, or medical office" as well as "[o]bservation" and "[h]ome care."

112.   Similarly, the medical record of a Medicare beneficiary admitted on July 28, 2009, to Defendant West Anaheim Medical Center included a set of guidelines pertaining to chest pain that largely tracked the corresponding Milliman Guideline, M-89, but entirely omitted the "Alternatives to Admission," which included treatment and evaluation protocols that could be carried out in an "[e]mergency department, chest pain center or rapid treatment site . . . ."

113.   That same set of guidelines also expanded one of the criteria that Milliman Guideline M89 identifies as supporting admission.  Milliman Guideline M89 identifies the "[i]nability to perform evaluation of a patient with possible A[cute] C[oronary] S[yndrome] . . . in the emergency department, chest pain center or other location capable of performing patient observation and evaluation" as a criteria supporting inpatient admission.  But the guidelines found in the record of the July 28, 2009, admission narrow the potential evaluation sites to only "the emergency department," deleting "chest pain center or other location capable of performing patient observation and evaluation" as options.   When coupled with Reddy's directive that insured patients should be allowed to remain in the ED no more than two hours before being admitted as an inpatient, this alteration significantly increased the likelihood of inpatient admission for Medicare beneficiaries presenting to the ED with chest pain.

114.   Similarly, the medical record of a Medicare beneficiary admitted on March 22, 2012, to Alvarado Hospital Medical Center included a set of guidelines pertaining to inpatient admission for cellulitis -- a bacterial infection of the skin and tissues beneath it -- that largely tracked the corresponding Milliman Guideline, M70.  The guidelines in the record entirely omitted the Milliman Guideline's "Alternatives to Admission."  And the guidelines in the record also excluded from M70 the definition of "[s]evere pain requiring acute inpatient management," which is defined in the Milliman Guideline as

being both "[c]ontinuous and frequent (e.g. every 2 to 4 hours parenteral analgesics required)" and having an expectation of "[r]apid improvement . . . from treatment or acute intervention (e.g. surgery, anesthesia procedure)."  By removing alternatives to inpatient admission and leaving the term "severe" open to interpretation, Prime's altered guidelines made inpatient admission for cellulitis more likely.

115.   In other instances, Prime added criteria beyond those identified in the corresponding Milliman Guideline as sufficient to justify inpatient admission.   In guidelines for abdominal pain, chest pain, transient ischemic attack and renal failure found in medical records of Medicare beneficiaries, for example, Prime had added an entirely open-ended admission criteria of "Other" that was not included in the corresponding Milliman Guidelines, M05, M89, M360 and M325, respectively.  And Prime added at least three additional criteria supporting inpatient admission for chest pain that are not found in the corresponding Milliman Guideline, M89: "significant E[lectrocardiogram] change," "hemodynamic abnormality," and "left bundle branch block."

> c.   *Prime Misled Physicians and Regulators Into Believing the Guidelines Used at Prime Hospitals Were Authentic Milliman Guidelines.*

116.   Prime was contractually obligated under its license agreement with MCG to include a disclosure on the face of any Milliman Guideline that Prime modified.  Most or all of the altered guidelines included the statement that "[p]ortions of the [Milliman Guidelines] content which have been revised are identified through the use of italic text." But Prime rarely, if ever, actually followed through to call out, via italics or otherwise, the alterations and omissions it made.

117.   In so doing, Prime caused its physicians, staff and auditors to believe that the guidelines Prime supplied were the same standards relied upon by other hospitals and by insurers throughout the United States.  They were not.

118.   Reddy testified under oath in 2014 that "[i]t would be illegal" to alter the Milliman Guidelines and then disseminate them for use in Prime hospitals.

119.   And when challenged by CMS on the medical necessity of an inpatient admission, Prime expressly assured CMS that inpatient admission was "justified . . . using industry standard guidelines," because "[t]he physician  . . . used Milliman Care Guidelines . . . , which are well-accepted admission guidelines, to assist in his/her decision."

120.   Prime has exploited the existence and acceptance of "industry standard guidelines" to not only stack the deck in favor of inpatient admission but also conceal from regulators and others who questioned Prime's tactics Prime's commitment to maximizing its return on every patient without regard to widely accepted standards of medical necessity.

### 5.      Prime's Business Model Infected Its Appeals to Administrative Law Judges.

121.   Reddy often assured physicians that they did not need to worry about having their inpatient admission decisions overturned by Medicare contractors such as MACs and RACs.  Reddy and Kumar advised physicians that Prime had adopted an aggressive strategy that involved appealing all denials of payment for inpatient hospital services.

122.   During a meeting in 2011, Reddy coached physicians on how to embellish patient medical records to make it appear that patients were sicker than they actually were and therefore, their admissions were justified.  Reddy told physicians that when they were admitting, they should always try to put something in the medical record that embellished the reasons for admission. Reddy specifically explained that the reason to do this was to persuade an administrative law judge (ALJ) who would decide the appeal of any claim that was denied.

123.   Reddy was referring to ALJs employed by the Office of Medicare Hearing and Appeals (OMHA), who review claim denials of Medicare claims.  ALJs are trained as attorneys, and do not typically have a medical background.

124.   Reddy often told physicians that whatever they included in the medical records would eventually be viewed by an ALJ and joked that physicians could easily fool the ALJ by documenting several co-existing conditions to make the patient's condition seem more grave and complex.  For example, during a 2012 meeting with physicians, Prime executives and medical personnel at Alvarado Hospital, Reddy described how physicians could mislead an ALJ by documenting several comorbid conditions that were not relevant to the admission to make the patient's condition appear more complex.

### 6.   Defendants' Knowledge of Their Submission of False Claims and False Certifications

125.   At all times pertinent to this complaint, Defendants were aware of CMS' guidance regarding when Medicare payment for an inpatient admission was appropriate, and when to bill Medicare for observation services.  Defendants were aware that nursing and medical care and diagnostic testing can be provided and billed as observation services when needed to determine whether a Medicare beneficiary's condition required inpatient admission instead of admitting a beneficiary whenever evaluation of her condition would take longer than an ED visit.

126.   Defendants submitted claims to Medicare on Form UB-92 HCFA-1450 and Form UB-04 CMS-1450.  For inpatient services Defendant Hospitals submitted an inpatient claim form (Type of Bill 11X).  For observation services Defendant Hospitals should have submitted an outpatient claim form (Type of Bill 13X).

127.   Each claim form contains an express certification by the provider.  For example, claims submitted on Form UB-04 CMS-1450, the hospital contain an express certification that, among other things:

"the billing information as shown on the face hereof is true, accurate and complete";

and

"the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

128.   Defendants knew that it was material to Medicare's decision to pay inpatient claims whether inpatient services were reasonable and necessary for the patient's health, as opposed to observation services, as well as whether inpatient services were provided.

129.   Defendants knew that to bill Medicare for observation services they should submit an outpatient claim (Type of Bill 13X) listing the appropriate HCPCS codes that map to an APC for the care that was furnished to the patient instead of billing on an inpatient claim form (Type of Bill 11X).

130.   By submitting inpatient claim forms using ICD-9-CM codes that map to a DRG that are used exclusively for inpatient admissions that they were representing to Medicare that the patient required inpatient admission.

131.   Defendants knew that they submitted inpatient claims to Medicare using ICD-9-CM codes that map to a DRG representing that inpatient admission was necessary and that inpatient services were provided for patients who did not require inpatient admission and who either (a) received only observation services; or (b) who received medically unnecessary inpatient services.

132.   Defendants chose to not order or bill for observation services when they were clinically appropriate for financial reasons.  As a foreseeable consequence of this decision, Defendants submitted false claims to Medicare for higher-paid inpatient admissions when only observation services were provided to beneficiaries.  The certifications on each such claim that the billing information was true, accurate and complete, and that "the submitter did not knowingly or recklessly disregard or

35

misrepresent or conceal material facts" were false because the patient's medical condition did not require inpatient admission and the care actually provided was consistent with observation services or treatment.

133.   In addition to the interim patient-specific claim payments, hospitals are required to annually submit a Medicare Cost Report.  The Medicare Cost Report determines a provider's Medicare reimbursable costs for a fiscal year.  42 U.S.C. § 1395g(a); 42 C.F.R. §413.20.  The cost report is the provider's final claim for payment from the Medicare program for the services rendered to all program beneficiaries for a fiscal year. Medicare relies on the Medicare Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare for the overpayment.  42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

134.   Each Medicare Cost Report contains an express certification that must be signed by the chief hospital administrator or a responsible designee of the administrator.

135.   The Medicare Cost Report Certification, which is a preface to the cost report's certification, provides the following prominent warning:

**MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST RPEORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW.  FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT.**

This advisory is followed by the actual certification language itself:

**CERTIFICATION BY OFFICER OR ADMINISTRATOR OF PROVIDER**
**I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [name of facility, ID number of facility] for the cost reporting period beginning [date] and ending [date] and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of the health care services, and**

36

**that the services identified in this cost report were provided in compliance with such laws and regulations.”**

CMS Form 2552, Medicare Cost Report.

136. Each Defendant Hospital executed and submitted a hospital cost report to Medicare annually which contained the above-quoted certification. The certifications were false in that the cost reports included inpatient days associated with paid inpatient claims that should have been billed as outpatient observation services or outpatient treatment, in violation of the Medicare law, regulations and Manual guidance regarding billing for inpatient services.

137. At all times relevant to this complaint, Defendants received communications and guidance from MACs and other Medicare contractors regarding appropriate billing for observation and inpatient services including, but not limited to, thousands of claims that were denied on either pre-pay or post-pay review.

138. At all times relevant to this complaint, Defendants understood and disregarded Medicare laws, regulations and program instructions regarding the use of observation services and the medical necessity of inpatient services.

139. Defendants knew that the claims and certifications that they submitted, or caused to be submitted, to Medicare were false, or else deliberately ignored, and/or were recklessly indifferent to, the truth or falsity of those certifications and claims.

**B.    Defendants Submitted or Caused the Submission of Inpatient Claims for Outpatient-Level Care or Medically Unnecessary Inpatient Care.**

140. Defendants have knowingly submitted or caused to be submitted false or fraudulent claims to Medicare on Form UB-92 HCFA-1450 or on Form UB-04 CMS-1450, with Type of Bill 11X indicated, signifying that inpatient services were provided, when the hospital planned and provided only outpatient-level care. Such claims have originated from each of the fourteen Defendant Hospitals. The following are illustrative examples of paid claims where a review of the medical records, taken at face value,

indicates that the inpatient services billed to Medicare should have been billed as either observation services or an ED visit.

141.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient A,[1] an 81-year-old Medicare beneficiary who presented to Defendant Alvarado Hospital on December 24, 2010, complaining of a cough and was discharged the next day.  Her symptoms were consistent with chronic respiratory failure and other pre-existing conditions, including chronic obstructive lung disease, that were noted in the record.  She had a history of reliance on supplemental oxygen.  She was given supplemental oxygen in the ED, which increased her oxygen saturation from 91% to 97%.   She was treated with an antibiotic for suspected bronchitis but was discharged a day later with no instructions to continue it.  Given her chronic conditions, her vital signs and symptoms did not support a diagnosis of acute respiratory failure necessitating interventions such as intubation or supportive ventilation, and none were provided.  The care the hospital planned and provided was consistent with observation services.  But defendants billed Medicare $14,128.65 for an inpatient admission on an inpatient type of bill for which Defendant Alvarado Hospital collected $8,112.58 from Medicare for DRG 189, which corresponds to pulmonary edema and respiratory failure.  This claim was false or fraudulent because Defendant Alvarado Hospital's medical records for the admission demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

142.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient B, a 77-year-old Medicare beneficiary who presented to Defendant Encino Hospital on October 1, 2012, after fainting in a hot, outdoor environment at an adult day care facility.  He was discharged the next day.  The

---

[1] The identities of individual Medicare beneficiaries discussed herein have been withheld to protect their privacy.  Their identities will be made available to Defendants.

38

emergency medical technician who arrived at the hospital with Patient B reported that Patient B was alert on arrival.  His vital signs were normal, and no significant physical findings were noted.   Patient B received fluids intravenously to address mild dehydration.  His fainting was suspected to be due to a vasovagal episode, a common condition that is mild and usually does not lead to harm or further complications.  These episodes are triggered by, among other things, prolonged standing, heat exposure or the sight of blood.  Patient B had no further episodes and was discharged the following morning.  His medical record includes an order to change Patient B's from an inpatient to an outpatient receiving observation services that was written at the time of discharge, approximately 18 hours after admission.  But defendants billed Medicare $14,116.10 for an inpatient admission on an inpatient type of bill for which Defendant Encino Hospital collected $4,263.42 from Medicare for DRG 312, which corresponds to syncope and collapse.  This claim was false or fraudulent because Defendant Encino Hospital's medical records for Patient B demonstrate recognition by the patient's treating physician that observation care was provided and should be billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

143.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient C, a 71-year-old Medicare beneficiary who presented to Defendant Huntington Beach Hospital on May 25, 2008, with a complaint of dizziness and was sent home the next morning.  On arrival, she felt nauseous and lightheaded, had vomited and had a history of diabetes.   In the ED, her vital signs were normal and she was treated with an anti-nausea medicine.  The results of her electrocardiogram test, used to detect problems with the electrical activity of the heart, her laboratory studies, and a computerized scan of her head were all unremarkable.  She was nevertheless admitted as an inpatient with a plan of care that consisted of observation and evaluation with additional laboratory tests.   No further diagnostic studies or therapeutic interventions were planned.  An inpatient admission was not

indicated for the brief period of observation the hospital provided to Patient C.  But defendants billed Medicare $9,258.64 for an inpatient admission on an inpatient type of bill for which Defendant Huntington Beach Hospital collected $3,650.74 from Medicare for DRG 312, which corresponds to syncope and collapse.  This claim was false or fraudulent because Defendant Huntington Beach Hospital's medical records for Patient C demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

144.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient D, a 76-year-old Medicare beneficiary who presented to Defendant Sherman Oaks Hospital on July 29, 2008, with a reported concern from the care facility where she lived that she had a facial droop.  She had a history of advanced Alzheimer's dementia and she was bedridden, confused and unable to follow directions.  Her vital signs were normal and her physical examination was described to be at her baseline, with no evidence of a facial droop.  Her laboratory studies were unremarkable and a computerized scan of her head showed significant atrophy in her brain.  The plan of care was to discharge her back to the care facility.  But she was ordered put on inpatient status late in the evening on July 29, 2008.  She was treated with an aspirin and no further diagnostic study or therapeutic intervention was planned or performed.  She was discharged back to the care facility the next day.  But defendants billed Medicare $7,615.85 for an inpatient admission on an inpatient type of bill for which Defendant Sherman Oaks Hospital collected $4,292.28 from Medicare for DRG 069, which corresponds to transient ischemia. This claim was false or fraudulent because Defendant Sherman Oaks Hospital's medical records for Patient D demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

145.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient E, a 78-year-old Medicare beneficiary who presented to Defendant Desert Valley Hospital on March 9, 2012, with vomiting, diarrhea, and general weakness following a colonoscopy nine days prior.  The ED doctor stated she was in "no apparent distress" and had normal bowel sounds and made no mention of abdominal tenderness.  She had no fever.  An elevated blood pressure of 203/107 was noted at the time of the hospital's triage assessment, but subsequent readings were lower, ranging from 126-144 over 83-99.  She was treated with broad-spectrum antibiotics for possible early pneumonia and a chest x-ray was performed.   By the following morning, a progress note stated that all symptoms had resolved.  An order for discharge was written approximately 24 hours after her arrival in the ED, with a discharge diagnosis of viral gastroenteritis, also known as the stomach flu.  The care the hospital planned and provided was consistent with observation services.  But defendants billed Medicare $10,444.78 for an inpatient admission on an inpatient type of bill for which Defendant Desert Valley Hospital collected $3,980.62 from Medicare for DRG 392, which corresponds to esophagitis, gastroenteritis and miscellaneous digestive disorders.  This claim was false or fraudulent because Defendant Desert Valley Hospital's medical records for Patient E demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

146.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient F, a 64-year-old Medicare beneficiary who presented to Defendant Paradise Valley Hospital on September 12, 2007, and was discharged the next day.  She complained of a two-day history of vertigo, which is a loss of balance or spinning sensations, with headache, similar to other headaches she had previously experienced.  Her medical history included high blood pressure, cardiomyopathy, anxiety, and depression.  There were no significant findings in the ED.

41

The admitting doctor noted that Patient F had been seen multiple times for similar symptoms.  Her vertigo was described on the admission note as resolved.  The plan of care was to continue to observe Patient F for 12 to 24 hours.  But defendants billed Medicare $9,184.16 for an inpatient admission on an inpatient type of bill and Defendant Paradise Valley Hospital collected $5,166.41 from Medicare for DRG 065, which corresponds to disequilibrium.  This claim was false or fraudulent because Defendant Paradise Valley Hospital's medical records for Patient F demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

147.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient G, a 74-year-old Medicare beneficiary who presented to Defendant Garden Grove Medical Center on April 20, 2009, and was discharged the next day.  She complained of abdominal pain and weakness.  She had been admitted to the hospital and evaluated for chest pain and abdominal pain earlier in the same month.  At that time, she had undergone a computerized scan of the abdomen and pelvis, an endoscopy and a stress test.   On April 20, 2009, her vital signs were unremarkable, she had no fever and her abdominal examination showed only mild tenderness.   Her laboratory studies were unremarkable.  She did not require pain medication and was treated with an anti-acid medication.  Her abdominal discomfort was assessed to be "nonspecific" and her plan of care consisted only of a colonoscopy and discharge.  Colonoscopies are routinely performed on an outpatient basis.  Neither inpatient admission nor even observation services were necessary to complete a colonoscopy for an otherwise stable patient like Patient G.   But defendants billed Medicare $13,407.04 for an inpatient admission on an inpatient type of bill for which Defendant Garden Grove Medical Center collected $6,642.43 from Medicare for DRG 392, which corresponds to esophagitis, gastroenteritis and miscellaneous digestive disorders.  This claim was false or fraudulent because Defendant Garden Grove Medical

42

Center's medical records for Patient G demonstrate that an ED visit was all that should have been provided and billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission, including medically unnecessary services.

148.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient H, an 84-year-old Medicare beneficiary who presented to Defendant Centinela Hospital Medical Center on March 8, 2011, with a complaint of intermittent chest pain lasting two days.  She was discharged the next day. She had a history of diabetes and hypertension, but she was not tachycardic or hypertensive – i.e., her heart was not racing and her blood pressure was not elevated. Her oxygenation and respiratory rate were normal and her vital signs were stable.  An electrocardiogram and cardiac enzyme test were performed.  A cardiologist examined her and concluded that the pain was pleuritic, a condition that involves inflammation of the tissue lining the lungs and inner chest wall and can cause chest pain, because it worsened with breathing.   Her signs and symptoms upon presentation, together with the stated plan of care – evaluation by a cardiologist -- were predictive of a short hospital stay and did not require an inpatient admission.   But defendants billed Medicare $22,502.71 for an inpatient admission on an inpatient type of bill and Defendant Centinela Hospital Medical Center collected $5,074.07 from Medicare for DRG 392, which corresponds to esophagitis, gastroenteritis and miscellaneous digestive disorders. This claim was false or fraudulent because Defendant Centinela Hospital Medical Center's medical records for Patient H demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

149.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient I, a 50-year-old Medicare beneficiary who presented to the ED at Defendant West Anaheim Medical Center on July 28, 2009, complaining of chest pain that developed while she was seated in her car.  She had a

history of diabetes mellitus, chronic obstructive pulmonary disease, and use of methamphetamine, cocaine, and tobacco.  In the ED, her vital signs were unremarkable.  An electrocardiogram performed there was unchanged versus her prior cardiology evaluations that found no cardiac disease.  Her toxicology screen was positive for methamphetamine.  She was treated in the ED with nitroglycerin and aspirin.  She was nevertheless admitted, with a plan of care that consisted of continuing her home medications, completing an additional cardiac marker and obtaining a cardiology consultation.   No additional therapeutic interventions were planned or provided.   Her cardiologist saw her the next day and, because she already had a scheduled outpatient cardiology evaluation, no further diagnostic study was pursued.  She was discharged on July 30, 2009.  Her presenting signs and symptoms and her plan of care were predictive of a short hospital stay that did not require an inpatient admission.  But defendants billed Medicare $11,808.56 for an inpatient admission on an inpatient type of bill and Defendant West Anaheim Medical Center collected $3,997.01 from Medicare for DRG 313, which corresponds to chest pain.  This claim was false or fraudulent because Defendant West Anaheim Medical Center's medical records for Patient I demonstrate that observation services were provided, and were the most that should have been billed to Medicare, but instead Defendant West Anaheim Medical Center admitted Patient I, provided medically unnecessary services, and billed Medicare for an unnecessary inpatient admission.

150.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient J, an 88-year-old Medicare beneficiary who presented to Defendant La Palma Intercommunity Hospital on April 16, 2008.  He presented to the ED hours after he was discharged to a nursing home from a six-day stay at the same hospital for treatment of pneumonia and pulmonary embolism, a blood clot in the lungs.   On returning to the hospital, he complained of chest pain.  There were no acute cardiopulmonary findings on examination, and the oxygenation of his blood was

44

an unremarkable 95% on room air, without supplemental oxygen.  On evaluation, both the pulmonologist and the cardiologist who examined him indicated that the symptoms were unlikely to be related to coronary disease and that a pulmonary origin was suspected.   He was discharged the following day to a nursing home.  When a patient is readmitted to the same hospital on the same day for a related condition, the Medicare Claims Processing Manual directs the hospital to combine the charges into one hospital claim rather than create a new claim.  But defendants billed Medicare $46,342.54 for the April 10, 2008 six day inpatient admission, and $10,937.22 for a second inpatient admission for the April 16, 2008 readmission and overnight stay.  Defendant La Palma Intercommunity Hospital collected $10,441.67 for April 10, 2008 admission for DRG 175, which corresponds to pulmonary embolism, and $4,447.08 for the overnight April 16, 2008, admission for DRG 313, which corresponds to chest pain.  The latter claim was false or fraudulent because Defendant La Palma Intercommunity Hospital's medical records for Patient J demonstrate that only observation services were provided and, in any event, the patient's continued care on April 16, 2008 was directly related to the condition present at discharge earlier that day and, therefore, was not eligible to be billed and paid as a separate inpatient admission.

151.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient K, a 73-year-old Medicare beneficiary who presented to Defendant Chino Valley Medical Center on April 26, 2012, after fainting. She had recently been evaluated in an urgent care for nausea and diarrhea and was standing in line to pick up her medication when she lost consciousness, fell backward and was caught by a bystander.  In the ED, she had no fever and her vital signs were stable.  Her abdominal examination and electrocardiogram were unremarkable and her laboratory studies were normal.  She was given intravenous fluids.  A neurologist who saw her the day she presented concluded the fainting resulted from her nausea and diarrhea.   Her gastrointestinal symptoms were attributed to gastroenteritis, also known

45

as the stomach flu.  By the next day, April 27, 2012, Patient K was described as feeling better.  She was discharged on April 28, 2013.  Inpatient services for an episode of fainting were unnecessary in the absence of an underlying cardiac, neurologic or other serious condition.  But defendants billed Medicare $27,302.41 for an inpatient admission on an inpatient type of bill and Defendant Chino Valley Medical Center collected $4,393.77 from Medicare for DRG 641, which corresponds to nutritional and miscellaneous metabolic disorders.  This claim was false or fraudulent because Defendant Chino Valley Medical Center's medical records for Patient K demonstrate that observation services provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

152.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient L, a 65-year-old Medicare beneficiary who presented to Defendant San Dimas Community Hospital on March 16, 2013, with uncontrolled hypertension, or high blood pressure, and a headache.  She had a history of hypertension and had been previously evaluated for headache.  Her blood pressure was elevated on arrival and came down after she received an oral anti-hypertensive medicine in the ED.  She was nevertheless admitted during the early morning hours on March 17, 2013.  A cardiologist who examined her recommended discharge once her headache was controlled.   She presented with no neurologic deficits but was evaluated with an MRI of the head and carotid Doppler studies.  Neither showed any acute pathology.  She was discharged on March 18, 2013.  An inpatient admission was not required to control her blood pressure with oral anti-hypertensive medicine or to treat her headache with analgesics.  But Prime billed Medicare $28,796.25 for an inpatient admission on an inpatient type of bill and Defendant San Dimas Community Hospital collected $3,233.27 from Medicare for DRG 305, which corresponds to hypertension .  This claim was false or fraudulent because Defendant San Dimas Community Hospital's medical records for Patient L demonstrate that observation services were provided and should have been

billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

153.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient M, a 45-year-old Medicare beneficiary who presented to Defendant Montclair Hospital on December 27, 2008 and was discharged two days later, on December 29, 2008.  She complained of sharp left-sided chest pain while eating.  She reported dizziness and vomiting several hours prior to experiencing chest pain.   She had a history of diabetes, hypertension, anxiety, and depression.  Her white blood cell count was elevated and the ED reported a rapid heart rate, or tachycardia, with a rate of 108.  After receiving medicine orally, her blood pressure decreased and then returned to normal.  The cardiologist who examined Patient M noted complete resolution of her symptoms.  Her signs and symptoms upon presentation, together with the stated plan of care – examination by a cardiologist -- were predictive of a short hospital stay and did not require an inpatient admission.   But defendants billed Medicare $14,051.92 for an inpatient admission on an inpatient type of bill and Defendant Montclair Hospital collected $3,760.63 from Medicare for DRG 313, which corresponds to chest pain.  This claim was false or fraudulent because Defendant Montclair Hospital's medical records for Patient M demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

154.   Defendants knowingly submitted or caused to be submitted a false or fraudulent claim to Medicare for Patient N, an 80-year-old Medicare beneficiary who presented to Defendant Shasta Regional Medical Center on March 2, 2010, and was discharged the next day.  She presented with complaints of flushing, nausea, sweating, shortness of breath and dizziness.  Her past medical history was unremarkable.  She was described as being in no distress, with a mild elevation of her blood pressure.  Her oxygen saturation was reported to have been normal (100%) and her electrocardiogram

did not demonstrate any acute cardiac changes or evidence of an irregular heartbeat.  She was hospitalized with a diagnosis of dizziness, lightheadedness and shortness of breath suspected to be due to a viral syndrome.   At the time of her admission, Patient N had normal vital signs and no fever.  She did not have objective findings of cardiac, neurologic or infectious disease.  The additional diagnostic studies that were completed and the treatment she received – administration of anti-anxiety medicine -- did not require an inpatient admission.   But defendants billed Medicare $5,036.28 for an inpatient admission on an inpatient type of bill and Defendant Shasta Regional Medical Center collected $3,936.28 from Medicare for DRG 312, which corresponds to syncope and collapse.  This claim was false or fraudulent because Defendant Shasta Regional Medical Center's medical records for Patient N demonstrate that observation services were provided and should have been billed to Medicare, but defendants instead billed Medicare for an unnecessary inpatient admission.

155.   The 14 admissions described above all resulted in claims to Medicare that were false because the inpatient admissions for which Prime and/or the 14 Defendant Hospitals billed Medicare were medically unnecessary.  Prime, Reddy and the 14 Defendant Hospitals submitted such claims, or caused them to be submitted, knowing that Medicare does not reimburse providers for medically unnecessary services.

156.   These fourteen claims are examples of a pattern of Prime's hospitals in California billing for inpatient services when only outpatient services were provided or only outpatient services should have been provided and billed to Medicare.

**COUNT I**
**Against All Defendants**
**False Claims Act: Presentation of False Claims**
**31 U.S.C. 3729(a)(1)(A), formerly 31 U.S.C. 3729(a)(1)**

157.   Paragraphs 1-156 are incorporated by reference as though fully set forth herein.

48

158.   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) presented or caused to be presented false or fraudulent claims for payment or approval to the United States.  Specifically, Defendants knowingly submitted false claims to Medicare on Forms UB-92 HCFA-1450, UB-04 CMS-1450, Type of  Bill 11X signifying an inpatient claim, and CMS-2552 for payment of medically unnecessary inpatient short stay admissions that should have been classified and billed as outpatient/observation cases.

159.   By virtue of the said false or fraudulent claims, the United States incurred damages and therefore is entitled to multiple damages under the False Claims Act, plus a civil penalty for each violation of the Act.

**COUNT II**
**Against All Defendants**
**False Claims Act: Making or Using False Records or Statements**
**31 § U.S.C. 3729(a)(1)(B) (formerly 31 U.S.C. 3729(a)(2))**

160.   Paragraphs 1-156 are incorporated by reference as though fully set forth herein.

161.   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to false or fraudulent claims paid or approved by the United States.  Specifically, Defendants knowingly made false statements to Medicare on Forms CMS-855A, CMS-8551, UB-92 HCFA-1450, UB-04 CMS-1450, Type of Bill 11X signifying an inpatient claim, and CMS-2552, regarding, *inter alia*, Defendants' compliance with Medicare requirements and the accuracy of Defendants' billing information and cost data.

162.   By virtue of the said false records and statements, the United States incurred damages.

**COUNT III**
**Against All Defendants**
**False Claims Act: Reverse False Claims**
**31 U.S.C. § 3729(a)(1)(G) (formerly 31 U.S.C. 3729(a)(7))**

163.   Paragraphs 1-156 are incorporated by reference as though fully set forth herein.

164.   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States.

165.   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

166.   Defendants knowingly (as "knowingly" is defined by 31 U.S.C. 3729(b)(1)) made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

167.   By virtue of the said false records, statements, or other acts of concealment, the United States incurred damages.

**COUNT IV**
**Against All Defendants**
**Restitution (Unjust Enrichment)**

168.   Paragraphs 1-156 are incorporated by reference as though fully set forth herein.

169.   Defendants have received money from Plaintiff United States to which Defendants were not entitled, which unjustly enriched Defendants, and for which Defendants must make restitution.  Defendants received such money by claiming and retaining Medicare payments for medically unnecessary inpatient short stay admissions which should have been classified and billed as outpatient/observation cases.  In equity and good conscience, such money belongs to Plaintiff United States.

170.   Plaintiff United States is entitled to recover such money or a portion of such money from each defendant named in the Claim for Relief in an amount to be determined at trial.

**COUNT V**
**Against Defendant Hospitals**
**Payment By Mistake**

171.   Paragraphs 1-156 are incorporated by reference as though fully set forth herein.

172.   Plaintiff United States paid money to Defendants as a result of a mistaken understanding.  Specifically, Plaintiff United States paid Hospitals Defendants' claims for Medicare reimbursement under the mistaken understanding that such claims were for reimbursement for medically necessary inpatient services, when in fact, they were for reimbursement for medically unnecessary inpatient short stay admissions which should have been classified and billed as outpatient/observation cases.  Had Plaintiff United States known the truth, it would not have paid such claims.  Payment therefore was by mistake.

173.   As a result of such mistaken payments, Plaintiff United States has sustained damages for which each defendant named in the Claim for Relief in an amount to be determined at trial.

**PRAYER**

WHEREFORE Plaintiff United States demands judgment as follows:

a.      On Counts I, II, and III (False Claims Act), against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, together with the maximum civil penalties allowed by law, costs, post-judgment interest, and such other and further relief as the Court may deem appropriate;

b.      On Count IV (Restitution), against all Defendants jointly and severally, for an amount equal to the monies that Defendants obtained from the United States without right and by which Defendants have been unjustly enriched, plus costs, pre-and post-

1   judgment interest, and such other and further relief as the Court may deem appropriate;
2   and,
3          c.     On Count V (Payment By Mistake), against each of the Defendant
4   Hospitals, for an amount equal to the United States' damages from each of them, plus
5   costs, pre-and post-judgment interest, and such other and further relief as the Court may
6   deem appropriate.

### **DEMAND FOR JURY TRIAL**

7          Plaintiff United States of America hereby demands a trial by jury.

10   Dated: June 30, 2017                    Respectfully submitted,

11                                           CHAD A. READLER
                                             Acting Assistant Attorney General
12                                           SANDRA R. BROWN
                                             Acting United States Attorney
13                                           DOROTHY A. SCHOUTEN, AUSA
                                             Chief, Civil Division
14                                           DAVID K. BARRETT, AUSA
                                             Chief, Civil Fraud Section
15                                           LINDA A. KONTOS, AUSA
                                             Deputy Chief, Civil Fraud Section
16                                           MICHAEL D. GRANSTON
                                             DANIEL R. ANDERSON
17                                           MARIE V. BONKOWSKI
                                             VANESSA I. REED
18                                           BENJAMIN C. WEI
                                             ADAM R. TAROSKY
19                                           Attorneys, Civil Division
                                             United States Department of Justice

21                                           /s/
                                             _____
22                                           ABRAHAM C. MELTZER
                                             Assistant United States Attorney

23                                           Attorneys for United States of America

52